SIXTH DIVISION
December 7, 2007

No. 1-07-0644

| | | |
|---|---|---|
| WEST BEND MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Plaintiff-Appellee, | ) ) | Appeal from the Circuit Court of |
| v. | ) ) | Cook County, Illinois |
| ROSEMONT EXPOSITION SERVICES, INC., an Illinois Corporation; and DAVID D. HOUSTON, | ) ) ) | No. 05 CH 10946 Honorable |
| Defendants-Appellants. | ) ) ) ) | Bernetta D. Bush Judge Presiding. |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

In 2002 and 2003, defendant, Rosemont Exposition Services, Inc. (RES), maintained liability insurance policies with plaintiff, West Bend Mutual Insurance Company (West Bend). In August of 2003, after two former employees brought suit against RES for defamation and retaliatory discharge, RES tendered a claim for coverage to West Bend pursuant to its policies. West Bend agreed to defend RES under its "Employment Practices Liability Insurance" policy and paid the cost of RES's defense until the $100,000 limit of that policy was exhausted. West Bend refused to continue to defend RES under its commercial general liability policy or its umbrella policy because it maintained that coverage for "employment related practices" was specifically excluded from those policies. West Bend filed a declaratory judgment action regarding its duty to defend RES under these policies, and RES filed a counterclaim in which it contended that the exclusion for "employment related practices" did not apply to its claim for

coverage. The parties filed cross-motions for summary judgment, and the circuit court ruled in favor of West Bend. RES appealed. For the reasons that follow, we affirm.

I. BACKGROUND

For the two years from July 15, 2002, through July 15, 2004, RES maintained identical liability insurance policies with West Bend. RES was the named insured on each of its policies and defendant David D. Houston was also an insured in his capacity as president and general manager. West Bend issued RES two insurance packages: a "Commercial Package Policy" for commercial general coverage and a "Commercial Package Policy" for commercial umbrella coverage. Among other coverages, the commercial general coverage package provided for "commercial general liability coverage" and "employment practices liability insurance."

The commercial general liability policy (hereinafter CGL policy) provided in pertinent as follows:

"COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'personal and advertising injury' to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or 'suit' that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b. This insurance applies to 'personal and advertising injury' caused by an offense arising out or your business but only if the offense was committed in the 'coverage territory' during the policy period."

The CGL policy defined "personal and advertising injury" as

"injury, including consequential 'bodily injury', arising out of one or more of the following offenses:

***

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;

e. Oral or written publication of material that violates a person's right of privacy."

The CGL policy's limit of liability for personal and advertising injury is $1 million and has

no deductible. RES paid its CGL policy premiums for the years in question.

The CGL contains an endorsement entitled "Employment-Related Practices Exclusion" (hereinafter ERP exclusion). The one-page document states: "This endorsement changes the policy. Please read carefully." It then states in pertinent part:

"This insurance does not apply to:

'Personal and advertising injury' to

(1) A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Employment-related practices, policies, acts or

omissions, such as coercion, demotion, evaluation, discipline, reassignment,

defamation, harassment, humiliation or discrimination directed at that person;

***

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any

other capacity."

In addition to the CGL policy, the commercial general coverage package contained the "employment practices liability insurance policy" (hereinafter EPLI policy), which appears in two parts of the package. The first part, which appears before the CGL policy in the package, is entitled "Employment Practices Liability Claims Made Endorsement" and consists of one page. It states that the limit of liability is $100,000, that there is a $5,000 retention for each related

4

wrongful employment practice, and that the premium is "INCL." The parties apparently agree that "INCL" means that the cost of this coverage was included in the other premiums of the package.

The second part of EPLI policy appears after the CGL policy and is entitled "Employment Practices Liability (Claims Made Policy)." This document consists of seven pages and states in pertinent part as follows:

> "This is a claims made and reported policy. Coverage is limited to liability for claims first made against you and reported to us while the coverage is in force.
>
> ***
>
> The limits of liability available to pay for judgements or settlements shall be reduced by amounts incurred for defense costs. Amounts incurred for defense costs shall be applied against the retention amount.

In consideration of the payment of the premium and in reliance on all statements made and information furnished to us, including the statements made in the Application and its attachments and any materials submitted therewith, all of which are made a part hereof, we agree to the policy as a contract with you.

***

SECTION I – INSURING AGREEMENT – WHAT IS COVERED

1. Insuring Agreement

> We shall pay those amounts the 'insured' is legally required to pay be reason of a 'claim' arising out of your 'wrongful employment practice' to which this

insurance applies.

*** 

SECTION VIII – DEFINITIONS

***

'Wrongful Employment Practice(s)' means any actual or alleged act of:

a. 'Discrimination'

b. 'Harassment'; or

c. Any actual or alleged wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of implied contract or implied covenant of good faith and fair dealing;

d. Employment related misrepresentation to an Employee or applicant for employment;

e. Employment related libel, slander, humiliation, defamation or invasion of privacy."

Finally, the "commercial umbrella liability policy" (hereinafter, "umbrella policy"), which appears in its own package, provides a $5 million limit of insurance. The umbrella policy contains an endorsement that states: "The Umbrella Liability Coverage Form does not apply to nor extend any coverage provided under *** [the] Employment Related Practices Coverage Form."


On August 29, 2003, Joseph and Marilyn Bagnall filed a three-count complaint against RES and Houston for defamation, retaliatory discharge and tortious interference with business

expectation. The complaint was subsequently amended on March 17, 2004, to include just two counts: a count for defamation on behalf of both Joseph and Marilyn, and a count of retaliatory discharge on behalf of Marilyn alone.

In the complaint, the Bagnalls alleged that they were employed as "riggers" by RES and explained that "riggers" help set up and dismantle large trade shows at convention centers by moving machinery, setting up and erecting machinery, and loading and unloading trucks. The complaint further alleged that on September 20, 2002, Marilyn was injured while operating a fork lift, that she reported the incident to her foreman, Russ Mossbarger, who in turn reported the incident to the union steward, Frank DiMarco, and that she was taken to the hospital by paramedics.

The complaint then attached a letter dated September 23, 2002, from Houston, RES's president and general manager, to Craig McDonald, an official at the rigger's union. This letter was the basis of the Bagnall's defamation claim and states as follows:

"Dear Craig,

Based on recent developments, RES would like to request that Rigger Local 136 no longer refer either Joe Bagnall or Marilyn Bagnall as employees of RES.

We have strong reason to believe that Mr. and Mrs. Bagnall are involved in a fraudulent claim against RES, and their presence here cannot benefit either the union or company until this matter has been resolved.

That should be it for now. Please let me know if you fell this matter is in

need of further discussion. In the meantime, thank you for your assistance."

The letter was copied to three individuals, Fred Schreier, Fulton and DiMarco; however, the Bagnolls alleged in their complaint that Houston "published the letter, or its contents, to other RES employees and Local 136 Union members." The complaint next alleged that on September 26, 2002, Joseph Bagnall was assigned by the rigger's union to work for RES and that when he arrived at the job location, DiMarco handed him a copy of Houston's September 23, 2002, letter in front of about 100 other workers. RES then refused to hire Joseph Bagnall on that day and has since refused to hire either Joseph or Marilyn.

With regard to the defamation count, the complaint alleged that the statement in Houston's letter "was made with full knowledge that it was untrue, or in reckless disregard for its truth or falsity, and for the purpose of injuring Joseph Bagnall's and Marilyn Bagnall's good name." With regard to the retaliatory discharge count, which applied solely to Marilyn, the complaint stated "RES terminated or refused to rehire Marilyn Bagnall as a result of Marilyn Bagnall's injury and anticipated workers' compensation claim that she was to file."

On September 8 and 24, 2003, RES, through counsel retained by it, sent letters to West Bend informing the insurance company of the Bagnalls' claim. West Bend's attorney responded by letter on September 25, 2003, acknowledging "receipt of the lawsuit" and stating:

"I have reviewed the allegations in the Complaint and have determined that [West Bend] potentially provides coverage for at least some of the allegations in the Complaint, such coverage being provided under the [EPLI policy]. The EPLI coverage is subject to a $5,000.00 self-insured retention, including defense fees, as

well as a $100,000.00 limit, which also includes defenses fees. Accordingly,

defense payments will diminish the available coverage to the insured after the

exhaustion of the $5,000.00 self-insured retention.

Please acknowledge receipt of my letter of today's date and formulate and

file responsive pleadings as appropriate."

RES's attorney responded by letter November 3, 2003, and informed West Bend that it

had filed a motion to strike and dismiss the Bagnall's complaint. The letter further stated:

"A review of the policies of insurance applicable to this claim indicates that

coverage under Coverage B, 'Personal and Advertising Injury' of the [CGL policy]

applies to Count I of the complaint alleging defamation. This coverage has a

$1,000,000 limit of liability and has no deductible. Please advise me how you

propose our office handle the billing of the defense of this claim in relation to the

counts to which other coverage applies."

West Bend's attorney then responded in a letter dated November 5, 2003, and pointed to

the employment related practices exclusion endorsement to the CGL policy. On August 19,

2005, West Bend's attorney again wrote to RES and stated:

"I have enclosed a copy of defense costs incurred in the above matter.

Those payments by [West Bend] total $96,149.11.

As was pointed out in my letter to you dated September 25, 2003, a copy

of which is enclosed, the EPLI coverage is in the amount of $100,000.00, which

includes defense costs.

9

Accordingly, [West Bend] only has $3,850.89 of available coverage."

After [West Bend] has paid its $100,00.00 limit in defense costs, it will no longer provide defense or indemnity for the claims of the Plaintiffs."

On January 5, 2006, RES, through its attorney, sent West Bend a letter informing West Bend that trial of the underlying action was imminent and demanding coverage pursuant to the CGL and umbrella policies. On January 11, 2006, RES settled with the Bagnalls and the case was dismissed with prejudice. The parties' settlement agreement and mutual release expressly denied liability on behalf of RES and Houston under the claims of the complaint and obligated RES to pay the Bagnalls the total sum of $75,000. On February 9, 2006, RES notified West Bend that the case had settled and made a final demand for coverage pursuant to the CGL policy.

On February 21, 2006, West Bend filed the declaratory judgment action from which this appeal stems, seeking declarations that coverage under the EPLI policy was exhausted, that CGL and umbrella polices excluded coverage for the claims raised in the Bagnall suit, and that the policies did not otherwise provide any additional coverage to RES. On April 17, 2006, RES filed an answer, affirmative defense, and counterclaims. As an affirmative defense, RES stated that West Bend was estopped from raising policy defenses to coverage because the underlying case alleged facts that potentially fell within the CGL policy and West Bend failed to cover or defend under a reservation of rights or promptly seek a declaratory judgment. RES's counterclaims consisted of three counts: a breach of contract claim, a declaratory judgment claim regarding West Bend's duty to defend, and a claim alleging vexatious an unreasonable conduct under section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 2006)) which sought attorney

fees and costs. On May 17, 2005, West Bend filed its answer to counts I and II of RES's counterclaim and filed a motion to dismiss count III, which the circuit court subsequently denied on August 16, 2006.

On November 1, 2006, West Bend filed a motion for summary judgment in which it argued that the CGL and umbrella policies did not provided coverage to RES for the Bagnall lawsuit. On November 30, 2006, RES filed a cross-motion for summary judgment on its counterclaims. RES cited only the Bagnalls' defamation claim and not Marilyn Bagnall's retaliatory discharge claim as the underlying basis for West Bend's obligations. On January 25, 2007, following oral argument, the circuit court granted West Bend's motion for summary judgment in its entirety and denied RES's cross-motion in its entirety. Specifically, the court found that Houston's allegedly defamatory letter to the rigger's union was exclusively employment related, thus making the CGL and umbrella policies inapplicable. The court also found that West Bend's declaratory judgment action was brought in a timely fashion because West Bend provided RES with a defense under the EPLI policy until the limits of that policy were exhausted and then filed declaratory action regarding the other policies within six weeks of RES's demand for additional coverage. Finally, the court found that RES was not entitled to recovery under section 155 because a *bona fide* coverage dispute existed. On appeal, the parties essentially make the same arguments they made below.

## II. ANALYSIS

On appeals from summary judgment motions we conduct a *de novo* review. Outboard Marine Corp. v. Liberty Mutual Insurance Co., 154 Ill. 2d 90, 102, 607 N.E.2d 1204, 1209

No. 1-07-0644

(1992). "Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Outboard Marine Corp., 154 Ill. 2d at 102, 607 N.E.2d at 1209. Where, as here, the parties file cross-motions for summary judgment, they agree that no issues of material fact exist and invite the court to decide the issues presented as questions of law. Harwood v. McDonough, 344 Ill. App. 3d 242, 245, 799 N.E.2d 859, 862 (2003).

RES contends that the circuit court erred as a matter of law in granting summary judgment to West Bend and in denying its cross-motion for summary judgment in three respects. RES first contends that the West Bend breached its duty to defend because the Bagnalls' claim for defamation did not fall within the scope of the ERP exclusion. RES next contends that West Bend was estopped from asserting policy defenses to RES's claim for coverage because West Bend did not defend under a reservation of rights and it waited too long to file a declaratory judgment action. Finally, RES contends that West Bend vexatiously and unreasonably denied coverage, entitling RES to recovery under section 155 of the Illinois Insurance Code (215 ILCS 5/155(1) (West 2006)).

In determining whether an insurer has a duty to defend an insured, we compare the allegations of the underlying complaint to the relevant coverage provisions of the insurance policy. See United States Fidelity & Guaranty Co. v. Wilkin Insulation Co., 144 Ill. 2d 64, 73, 578 N.E.2d 926, 930 (1991); Pekin Insurance Co. v. L.J. Shaw & Co., 291 Ill. App. 3d 888, 891, 684 N.E.2d 853, 864 (1997). "If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage provisions, then the insurer has a duty to defend the

12

No. 1-07-0644

insured in the underlying action." Pekin Insurance Co., 291 Ill. App. 3d at 891, 684 N.E.2d at 864. However, where it is "clear from the face of the underlying complaint[] that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage," an insurer may justifiably refuse to defend. (Emphasis omitted.) Wilkin Insulation Co., 144 Ill. 2d at 73, 578 N.E.2d at 930. An insurer's duty to defend is "much broader than its duty to indemnify" (La Grange Memorial Hospital v. St. Paul Insurance Co., 317 Ill. App. 3d 863, 869, 740 N.E.2d 21, 27 (2000)), but where a court "properly holds that an insurer has no duty to defend, the court may also hold that the insurer has no duty to indemnify" (State Farm Fire & Casualty Co. v. Hatherley, 250 Ill. App. 3d 333, 336, 621 N.E.2d 39, 42 (1993).

It is the insurer's burden to show that a claim falls within a provision of the policy that excludes coverage, and an exclusion relied upon to deny coverage must be free and clear from doubt. Pekin Insurance Co., 291 Ill. App. 3d at 892, 684 N.E.2d at 864. All the provisions of an insurance policy must be read together to determine whether an ambiguity exists, and any ambiguity will be construed against the drafter of the policy and in favor of coverage. Continental Casualty Co. v. McDowell & Colantoni, Ltd., 282 Ill. App. 3d 236, 241, 668 N.E.2d 59, 62 (1996). However, where no ambiguity exists, Illinois courts will apply insurance policies as written. Hatherley, 250 Ill. App. 3d at 337, 621 N.E.2d at 42.

Here, the parties primarily disagree as to the scope of the ERP exclusion. Specifically, RES contends that the Bagnalls' claim was not employment related because the allegedly defamatory letter did not address the actual work performance of the Bagnalls but only the "extra-employment relationship" created between the parties upon Marilyn's initiation of a

No. 1-07-0644

workers' compensation claim. In support of its contention, RES relies heavily upon what appears to be the only Illinois case to have spoken on the scope of ERP exclusions found in commercial general liability policies, American Alliance Insurance Co. v. 1212 Restaurant Group, L.L.C., 342 Ill. App. 3d 500, 794 N.E.2d 892 (2003). We find RES's argument to be wholly untenable and insufficiently supported by 1212 Restaurant.

In 1212 Restaurant, the defendant restaurant attempted to obtain insurance coverage under a commercial general liability policy to defend against claims of breach of contract and defamation brought by a former employee. 1212 Restaurant, 342 Ill. App. 3d at 502, 794 N.E.2d at 894. In the underlying complaint, the employee, Alexander, alleged that he was employed as a "front house manager" of the defendants' restaurant; that he injured his foot on the job and had to wear a brace on his foot; that two of his superiors repeatedly told him to " 'lose the shoe,' meaning not to wear the brace because they did not want a 'gimp' at the front door of the restaurant"; that the same superiors repeatedly called him " 'gimp,' " " 'cokehead,' " " 'faggot,' " and " 'homo' " in front of other employees; that his supervisor presented him with a separation agreement and threatened to tell people he was " 'robbing the joint' " if he refused to sign the agreement; and that the supervisor did, in fact, tell people that Alexander was " 'robbing the joint.' " 1212 Restaurant, 342 Ill. App. 3d at 503, 794 N.E.2d at 895. The defendant restaurant tendered its defense to the plaintiff insurance company pursuant to its commercial general liability policy. 1212 Restaurant, 342 Ill. App. 3d at 503, 794 N.E.2d at 895. The insurance company refused to defend under the policy and brought a declaratory judgment action. 1212 Restaurant, 342 Ill. App. 3d at 503, 794 N.E.2d at 895. The policy in 1212 Restaurant contained the

14

following exclusion (the language of which is identical to the instant ERP exclusion):

" 'This insurance does not apply to:

"Personal and advertising injury";

1. A person arising out of any:

\*\*\*

(b) termination of that person's employment; or

(c) employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, decipline [sic], defamation, harassment, humiliation, discrimination directed at that person.' " 1212 Restaurant, 342 Ill. App. 3d at 504, 794 N.E.2d at 895.

The circuit court granted summary judgment to Alexander and held that the insurer had a duty to defend. 1212 Restaurant, 342 Ill. App. 3d at 502, 794 N.E.2d at 894.

After comparing the allegations of the complaint to the language of this ERP exclusion, and after reviewing several cases from other jurisdictions that had addressed the issue (see Loyola Marymount University v. Hartford Accident & Indemnity Co., 219 Cal. App. 3d 1217, 1220-21, 271 Cal. Rptr. 528, 529 (1990); Frank & Freedus v. Allstate Insurance Co., 45 Cal. App. 4th 461, 465, 52 Cal. Rptr. 2d 678, 680-91 (1996); HS Services, Inc. v. Nationwide Mutual Insurance Co., 109 F.3d 642, 644 (9th Cir. 1997); Golden Eagle Insurance Corp. v. Rocky Cola Café, Inc., 94 Cal. App. 4th 120, 123, 114 Cal. Rptr. 2d 16, 17-18 (2001); Low v. Golden Eagle Insurance Co., 104 Cal. App. 4th 306, 314, 128 Cal. Rptr. 2d 423, 428-29 (2002); Adams v. Pro Sources, Inc., 231 F. Supp. 2d 499 (M.D. La. 2002)), the appellate court found that at least some of the

15

alleged defamatory statements were not employment related and the insurer was, therefore, duty bound to defend. 1212 Restaurant, 342 Ill. App. 3d at 510, 794 N.E.2d at 901. Before reaching its decision, however, the court first rejected the proposition apparently asserted by Alexander and relied upon by the circuit court that posttermination defamation could not be considered employment related. 1212 Restaurant, 342 Ill. App. 3d at 509-10, 794 N.E.2d at 900. Nevertheless, the court found that the insurer had a duty to defend, noting that what was important was not necessarily the timing of the defamation, but whether it was made in the context of the employment. The court stated: "[T]he salient question is whether the alleged defamatory statements were made in the context of Alexander's employment and related to his employment performance." 1212 Restaurant, 342 Ill. App. 3d at 510, 794 N.E.2d at 900. The court concluded that the insurer had a duty to defend because the employer's statements regarding Alexander's sexual activities and that he was a "cokehead" constituted personal insults and lewd comments separate from his employment.[1] 1212 Restaurant, 342 Ill. App. 3d at 510, 794 N.E.2d at 900.

---

[1]Although not specifically articulated in 1212 Restaurant, it would appear that the court concluded that the statement that Alexander was "robbing the joint" may have been employment related. However, because an insurer has a duty to defend against an entire lawsuit even where that duty is based on less than all the allegations of the complaint (see Wilkin Insulation Co., 144 Ill. 2d at 73, 578 N.E.2d at 930), the court in 1212 Restaurant needed only to determine if any of the allegations implicated that duty.

RES appears to contend that this "salient question" from 1212 Restaurant constitutes a black letter rule of law by arguing that only defamatory statements relating directly to employment performance can be deemed employment related for purposes of the ERP exclusion. In that regard, RES contends that the alleged defamation in this case, that the Bagnalls were taking part in a fraudulent workers' compensation claim, did not relate to their actual work performance but rather to matters beyond the purview of their employment. We disagree.

1212 Restaurant did not proclaim that only defamatory remarks directed at employment performance can be deemed employment related for purposes of ERP exclusions. Rather, the court merely noted that whether the defamatory statements were made "in the context of *** employment and related to *** employment performance" was "the salient question" to be asked under the facts of its case. 1212 Restaurant, 342 Ill. App. 3d at 510, 794 N.E.2d at 900. The court made this statement immediately after rejecting the proposition that posttermination defamation could not be employment related. What was important was not necessarily the timing of the defamation, but whether it was related to the underlying claimant's employment – employment performance being a prime example of something that is employment related.

Moreover, the word "salient" does not mean "exclusive," "determinative," or "paramount" as RES's interpretation of 1212 Restaurant would require. Rather the term, in the context of its use in 1212 Restaurant, is defined as "standing out conspicuously; prominent, striking." Webster's Seventh New Collegiate Dictionary 759 (1969). Along these lines, it cannot be doubted that, in determining whether defamatory remarks are employment related, the question of whether those remarks were directed at employment performance would be prominent. However,

17

No. 1-07-0644

we believe that to construe the ERP exclusion's use of the phrase "employment related" as referring exclusively to matters related to employment performance would unduly limit an otherwise broad and unambiguous term. See Wilkin Insulation Co., 144 Ill. 2d at 74, 578 N.E.2d at 930 ("Where a policy provision is clear and unambiguous, its language must be taken in its 'plain, ordinary and popular sense.' [Citation.]"). In any event, we do not disagree with the court's conclusion in 1212 Restaurant that the alleged defamatory statements regarding Alexander's sexuality were not related to his employment.

In this case, the alleged defamation consisted of Houston's averment that the Bagnalls were involved in a fraudulent workers' compensation claim. However, the purpose of the letter was not merely to defame the Bagnalls but to request that the rigger's union cease referring the Bagnalls to RES for work. In other words, the letter was a request to terminate the Bagnalls' employment with RES and cited the allegedly fraudulent claim as the reason for that termination. In this regard, we note that, on appeal, RES does not assert Marilyn Bagnall's retaliatory discharge claim as a basis for West Bend's duty to defend. Rather, RES focuses exclusively on the underlying defamation claim but asserts that it was not employment related because it did not relate to employment performance. However, the ERP exclusion states that the insurance does not apply to injury "to a person arising out of any *** "(b) termination of that person's employment; or (c) employment related practices, policies acts or omissions , such as *** defamation." RES would have us focus exclusively on subsection (c)'s use of "defamation" without giving equal regard to subsection (b)'s mention of "termination." However, even if we were to agree with RES that the alleged defamation in this case did not relate to the Bagnalls'

18

work performance (a distinction which, although relevant, is not necessarily determinative), it cannot be denied that Houston's allegedly defamatory statement was directly related to the termination of the Bagnalls' employment with RES and was, in that regard, clearly employment related.

This result is consistent with a number of the cases that have addressed ERP exclusions. For instance, in Frank & Freedus, the California Court of Appeals, addressing a nearly identical ERP exclusion, found that the insurer did not have a duty to defend the insured against a defamation claim that was "made in the context of and related to [the underlying plaintiff's] termination of employment." Frank & Freedus, 45 Cal. App. 4th at 472, 52 Cal. Rptr. 2d at 684. Similarly, in Loyola Marymount, the court found that the underlying plaintiffs' claims of defamation and invasion of privacy brought against the insured were excluded from coverage by an ERP exclusion because those claims were "part and parcel of allegedly wrongful termination of the plaintiffs' employment." Loyola Marymount, 219 Cal. App. 3d at 1223, 271 Cal. Rptr. At 531. On the other hand, in Rocky Cola, the court found that the underlying plaintiff's allegation that her supervisor defamed her by calling her sexually promiscuous was not employment related; however, in that case, the underlying plaintiff and her supervisor had been involved in sexual relationship, the underlying plaintiff was not terminated from employment, and the alleged defamation had no relation whatsoever to termination. Rocky Cola, 94 Cal. App. 4th at 128-29, 114 Cal. Rptr. 2d at 21-23. See also HS Service, 109 F.3d at 646 (finding that insured's remarks that a former employee was dishonest were not employment related because the remarks were not directed at the parties' former employer/employee relationship but at their present relationship as

19

competitors in the marketplace). Thus, while defamation directed at a person's employment performance would certainly be employment related, so too would any defamation perpetrated as an explanation or justification for terminating a person's employment regardless of its connection to employment performance. In that regard, we note that in 1212 Restaurant, the underlying plaintiff did not allege that he was fired because his employers believed him to be a homosexual or that they cited such a factor as a basis for terminating his employment. Thus, those instances of defamation related to his sexuality were beyond the scope of his employment because they had no bearing on his employment performance and were unrelated to his termination. See 1212 Restaurant, 342 Ill. App. 3d at 510, 794 N.E.2d at 900.

RES contends, however, that even if the defamation as to Marilyn Bagnall were employment related and therefore excluded from coverage, the same could not be said for Joseph Bagnall because he did not file a workers' compensation claim and did not sustain any injury during his employment, but was merely a witness in the workers' compensation claim brought by Marilyn. RES argues that these facts created an extra-employment relationship between Joseph and RES insofar as the defamatory statement related to something Joseph did not as an employee, but as the husband of an employee. Consequently, RES argues that the alleged defamation as to Joseph arose from an extra-employment relationship which, for coverage purposes, should be treated as unrelated to his employment.

We note that this factor of having an extra-employment relationship was discussed in Low. There, after discussing Loyola Marymount, Frank &Freedus, Rocky Cola, and HS Services, the court concluded that two relevant factors in determining whether defamation is

employment related include "(1) the nexus between the allegedly defamatory statement (or other tort) at issue and the third party plaintiff's employment by the insured, and (2) the existence (or nonexistence) of a relationship between the employer and the third party plaintiff outside the employment relationship." (Emphasis omitted.) Low, 104 Cal. App. 4th at 314, 128 Cal. Rptr. 2d at 428-29. The court then noted that the third-party plaintiff in HS Services, who had become a business competitor of the insured, and the third-party plaintiff in Rocky Cola, who had a sexual relationship with her supervisor, had extra-employment relationships which would support the conclusion that the defamations were not employment related. Low, 104 Cal. App. 4th at 314, 128 Cal. Rptr. 2d at 428. On the other hand, the court noted that no such extra-employment relationship existed in Loyola Marymount, where two university employees were terminated, one for marrying while being a priest and the other for negligence, or in Frank & Freedus, where the employer asserted that it fired the underlying plaintiff for poor performance. Low, 104 Cal. App. 4th at 314, 128 Cal. Rptr. 2d 428-29.[2]

We fail to see how the instant case is more like HS Services and Rocky Cola than Loyola Marymount and Frank & Freedus. Here, Joseph was not a competitor of RES and he did not have any personal relationship with any of his superiors at RES. Rather, he participated as a witness in a workers' compensation claim brought by his wife and coworker and was terminated

_____

[2]We further note, that while the alleged defamations in the former cases did not relate to or describe the terminations of the underlying plaintiffs, the defamations in these latter cases, where no extra-employment relationship was found, did, in fact, directly related to the terminations.

from his employment purportedly because that claim was fraudulent. More importantly, however, like in Loyola Marymount and Frank & Freedus, the alleged defamation directed against him was directly related to his termination from employment. Although, as emphasized by RES, Joseph Bagnall did not bring a retaliatory discharge claim, he was, in fact, terminated from his employment. The Bagnall complaint specifically states that Joseph was assigned by the rigger's union to RES on September 26, 2002, six days after Marilyn's injury, and that RES refused to hire him. The complaint further alleges that since the date of Marilyn's injury, RES has refused to hire either Marilyn or Joseph Bagnall. Thus, regardless of the actual claims brought, the Bagnalls' complaint makes clear that both Marilyn and Joseph were terminated from their employment with RES and that the alleged defamation in this case was "part and parcel" of that termination and, therefore, clearly employment related. See Loyola Marymount, 219 Cal. App. 3d at 1223, 271 Cal. Rptr. at 531; accord Frank & Freedus, 45 Cal. App. 4th at 472, 52 Cal. Rptr. 2d at 684-85.

Thus, it is clear that the allegations of the underlying complaint fail to state facts that would bring the case within or potentially within the CGL policy's coverage. See Wilkin Insulation Co., 144 Ill. 2d at 73, 578 N.E.2d at 930. The sole defamatory statement alleged in the Bagnalls' complaint was that they were involved in a fraudulent workers' compensation claim. That alleged defamation was perpetrated to provide the grounds for RES's termination of the Bagnalls' employment and can, therefore, only be construed as being employment-related. The complaint makes no additional allegations of defamation that could ultimately bring the case beyond the scope of the ERP exclusion.

We additionally note that RES has not specifically argued on appeal that a duty can be found in the umbrella policy apart from the CGL policy. In fact, RES has focused exclusively on the ERP exclusion, which is contained in the CGL policy. In any event, however, the umbrella policy clearly states that it does not apply to the EPLI policy. Thus, the umbrella policy can only be interpreted as supplementing the CGL policy, which, as we have discussed, does not provide coverage for the Bagnalls' claims by virtue of the ERP exclusion.

Our finding with respect to West Bend's duty to defend effectively negates RES's additional argument that West Bend was estopped from asserting defenses to the claim by reason of its failure to undertake the defense under a reservation of rights or bring a prompt declaratory judgment action. See Employers Insurance of Wausau v. Ehlco Liquidating Trust, 186 Ill. 2d 127, 151, 708 N.E.2d 1122, 1135 (1999) ("Application of the estoppel doctrine is not appropriate if the insurer had no duty to defend, or if the insurer's duty to defend was not properly triggered. These circumstances include where the insurer was given no opportunity to defend; where there was no insurance policy in existence; and where, *when the policy and the complaint are compared, there clearly was no coverage or potential for coverage*" (emphasis added)). Correspondingly, our finding negates RES's claim that West Bend vexatiously and unreasonably withheld coverage in violation of section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 2006). Martin v. Illinois Farmers Insurance, 318 Ill. App. 3d 751, 764, 742 N.E.2d 848, 857-58 (2000) ("[A] defendant cannot be liable for section 155 relief where no benefits are owed. [Citation.] *** As defendants owed no further benefits to plaintiff under their respective policies, defendants could not have committed the vexatious and unreasonable conduct necessary for

23

section 155 relief").

### III. CONCLUSION

For all the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

McNULTY and O'MALLEY, JJ., concur.