2026 IL App (1st) 250511-U

SECOND DIVISION
April 14, 2026

No. 1-25-0511

**NOTICE**:  This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| PAN-OCEANIC ENGINEERING COMPANY, INC., | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, Cross-Appellee, | ) ) | |
| v. | ) ) | No. 21 CH 1439 |
| GRANGE MUTUAL INSURANCE, | ) ) ) | Honorable Cecilia A. Horan, |
| Defendant-Appellee, Cross-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices McBride and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1     ***Held*:**  We affirm the circuit court's summary judgment decision and attorney fee order.

¶ 2     Pan-Oceanic Engineering Company, Inc. (Pan-Oceanic) held an automobile insurance policy with Grange Mutual Insurance (Grange). Pan-Oceanic's employee, Lavonta Green, while driving a Pan-Oceanic company truck, collided with another vehicle driven by Fletcher McQueen. McQueen then sued Green and Pan-Oceanic for personal injuries. McQueen's lawsuit, which

eventually included a request for punitive damages, resulted in a jury verdict in his favor that awarded both compensatory damages and punitive damages. This led to a coverage dispute between Pan-Oceanic and Grange. Pan-Oceanic filed a declaratory judgment action, requesting the court declare that Grange must cover punitive damages, appeal bonds, and certain attorney fees. The parties eventually cross-moved for summary judgment, and the circuit court issued an order that, among others, required Grange to pay attorney fees for the underlying litigation but found that Pan-Oceanic was responsible for punitive damages awarded in the underlying litigation. The parties appeal virtually every aspect of the circuit court's summary judgment decision. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                          A. The Underlying Personal Injury Matter

¶ 5      This coverage dispute appeal stems from a 2012 vehicular collision. To fully understand this appeal, we provide background information as to the personal injury lawsuit that eventually led to the appeal.

¶ 6      On August 17, 2012, Green was an employee of Pan-Oceanic. On that day, Green received instructions to pick up a piece of digging equipment and transport it on a flatbed truck. Green allegedly reported that the equipment had been loaded onto the flatbed incorrectly, but upon reassurance from a Pan-Oceanic supervisor, he drove the flatbed truck and lost control. The truck's trailer swung into a car that McQueen was driving, injuring McQueen. At that time and all times relevant hereto, Pan-Oceanic carried a commercial automobile insurance policy ("Policy") with Grange.

¶ 7      On January 31, 2014, McQueen sued both Pan-Oceanic and Green for personal injuries. Pan-Oceanic agreed to Grange defending it in the lawsuit. Grange in turn assigned its panel

counsel, attorney Daniel Suber, to defend the case. Suber initially began billing at the rate of $155 per hour.

¶ 8     On March 1, 2017, the circuit court issued a written order granting McQueen leave to amend his complaint to request punitive damages. On March 8, 2017, McQueen filed his amended complaint, which sought both compensatory and punitive damages. The complaint did not indicate a specific dollar amount of punitive damages sought.

¶ 9     On March 2, 2017, Suber emailed Grange's senior litigation counsel a letter to notify her of the upcoming trial, commenting that the court "quite surprisingly" granted McQueen's motion for leave to amend his complaint to request punitive damages. The extensive email explained that the addition of punitive damages "increase[d] the risks associated with the case from the standpoint of the insured." The emailed letter appears in the record before us; there is no indication of a response from Grange.

¶ 10    Suber also notified Pan-Oceanic, and on March 6, 2017, Pan-Oceanic's president, Gulzar Singh, signed a document allowing Suber to continue representing Pan-Oceanic. The document Singh signed indicated his acknowledgement of the following: (1) the Policy did not cover punitive damages, (2) McQueen's addition of punitive damages created a potential conflict of interest between Grange and Pan-Oceanic, and (3) Pan-Oceanic was free to retain its own independent counsel to represent it and Green against McQueen's lawsuit. Pan-Oceanic did not seek independent counsel and instead agreed Suber would continue to represent it.

¶ 11    In May 2017, the matter proceeded to a jury trial in which the jury found in McQueen's favor against Pan-Oceanic but not against Green. The jury awarded McQueen $163,227.45 in compensatory damages and $1,000,000 in punitive damages.

¶ 12　On August 14, 2017, Pan-Oceanic, through Suber, moved the circuit court to enter a judgment notwithstanding the verdict or grant a new trial, arguing that the jury's findings were inconsistent. The circuit court denied the motion. Pan-Oceanic sought to appeal, but because the judgment was immediately enforceable, Illinois law required Pan-Oceanic to first post an appeal bond to stay collection efforts while it filed appeal and while the appeal was pending.[1]

¶ 13　The primary issue in that appeal was whether "an employer's admission of vicarious liability for its employee's misconduct precludes a plaintiff from raising claims of direct negligence based on the employer's own conduct." *McQueen v. Green*, 2022 IL 126666, ¶ 34. The appellate court concluded that it does, and on that basis, ruled that the verdicts were legally inconsistent. *Id.* Pan-Oceanic filed a petition for leave to appeal, which the Illinois Supreme Court allowed. Suber then began billing at a higher rate of $350 per hour.

¶ 14　Our supreme court considered the same issue: whether "an employer's admission of vicarious liability for its employee's misconduct precludes a plaintiff from raising claims of direct negligence based on the employer's own conduct." *Id.* The Court noted that "courts nationwide are split on this issue." *Id.* ¶ 38. Ultimately, the supreme court reversed the appellate court's judgment, thereby affirming the original judgment of the circuit court. *Id.* ¶¶ 62-64. It reasoned that the jury's verdicts were not legally inconsistent and held that an employer's acknowledgement of vicarious liability does not preclude a plaintiff from raising a direct negligence claim against the employer. *Id.* ¶ 60.

---

[1]Pan-Oceanic posted a $1.5 million bond and appealed. Grange reimbursed Pan-Oceanic in the amount of $4,356.24. This represented 14% of the entire amount of damages awarded, which was $1,163,227.45. Grange arrived at the 14% figure by computing the amount of compensatory damages as a ratio of total damages in the case.

¶ 15 Pursuant to the ruling, Pan-Oceanic paid McQueen $1,000,000 for the punitive damages, Grange paid McQueen for compensatory damages of $148,227.45 with interest of $516,724.52, and Grange partially covered attorney Suber's fees.

¶ 16                                    B. Coverage Dispute at Issue

¶ 17 Based on the foregoing, a coverage dispute arose between Pan-Oceanic and Grange. Their main disagreements included whether the Policy covered appeal bonds, Suber's increased attorney fees, and the $1,000,000 jury award of punitive damages. In March 2021, Pan-Oceanic filed a declaratory action against Grange.

¶ 18                                    1. Pan-Oceanic's Complaint

¶ 19 In May 2022, Pan-Oceanic filed the six-count amended complaint, which is the operative complaint for purposes of this appeal.

¶ 20 Count I, breach of contract, alleged that Grange breached the insurance contract by refusing to pay the full cost of the appeal bond premiums incurred to stay enforcement of the judgment during the appeal of the underlying case. Pan-Oceanic requested judgment for the unpaid appeal bond premiums (approximately $89,000).

¶ 21 Count II, another breach of contract claim, claimed Grange failed to pay all reasonable attorney fees incurred in the defense of the underlying action, particularly those that Suber billed at the increased $350 per hour rate. Pan-Oceanic requested judgment for all unpaid attorney fees.

¶ 22 Count III, the third and last breach of contract claim, alleged that Grange breached its duty by not notifying Pan-Oceanic of its right to independent counsel at Grange's expense when a conflict of interest arose.

¶ 23 Count IV requested a declaration that Grange was estopped from denying coverage for the punitive damages.

¶ 24    Count V requested a declaration that Grange had a duty to compensate Pan-Oceanic for all costs in the underlying action, including payment of all defense costs, attorney fees, and appeal bond premiums.

¶ 25    Count VI alleged that Grange's conduct in handling the claim was unreasonable and vexatious under section 155 of the Illinois Insurance Code. See 215 ILCS 5/155 (West 2024). Pan-Oceanic sought all monetary remedies available under that section.

¶ 26                    2. Grange's Counter-Complaint and Answer

¶ 27    In July 2022, Grange filed its counter-complaint for declaratory judgment as well as its answer and affirmative defenses.

¶ 28                    a. Grange's Counter-Complaint

¶ 29    On July 14, 2022, Grange filed its counter-complaint for declaratory judgment.

¶ 30    Count I requested the court declare that no conflict of interest existed when punitive damages were added to the underlying action.

¶ 31    Count II requested a declaration that Suber was not entitled to raise his rates because he was panel counsel that Grange retained, and Suber could not unilaterally raise his rates.

¶ 32    Grange pleaded count III in the alternative to counts I and II and asserted that if a conflict of interest did exist, Grange would ask the court to declare that Pan-Oceanic waived any such conflict because it signed a waiver allowing Suber to continue representing it.

¶ 33    Count IV, also in the alternative, requested a declaration that even if a conflict existed, Suber would have had to be truly independent to raise his rate. Thus, he could not raise his rate, and Grange did not owe coverage at a higher rate.

¶ 34                    b. Grange's Answers and Affirmative Defenses

¶ 35    On July 18, 2022, Grange filed its answers and affirmative defenses. As to Pan-Oceanic's first count, Grange admitted Pan-Oceanic incurred costs for posting a bond for the appeal but denied it had any contractual obligation to cover it. Grange argued the Policy covered only certain bonds (bail bonds, bonds to release attachments) but not appeal bonds.

¶ 36    As to count II, Grange denied it was required to pay all of Suber's attorney fees at a higher rate. Grange argued there was no actual conflict of interest requiring independent counsel, so it was not obligated to pay the higher rate or all fees claimed by Pan-Oceanic.

¶ 37    As to count III, Grange denied breaching any duty to notify Pan-Oceanic of the right to independent counsel. Grange asserted that Pan-Oceanic's own defense counsel (Suber) informed it that punitive damages were not covered, and that Pan-Oceanic signed waivers acknowledging this.

¶ 38    As to count IV, Grange denied that it had waived or was estopped from asserting Policy defenses. Grange argued that public policy against insuring punitive damages for one's own misconduct cannot be waived or created by estoppel, regardless of its conduct. That is, public policy prohibits coverage for punitive damages, which cannot be waived or created by estoppel.

¶ 39    As to count V, Grange admitted it had a duty to defend Pan-Oceanic in the underlying action but denied any obligation to pay for the appeal bond or all attorney fees claimed. Grange argued it fulfilled its duty by providing a defense and paying reasonable fees.

¶ 40    As to Count VI, Grange denied its conduct was unreasonable or vexatious. Grange asserted there was a *bona fide* dispute over coverage and that its actions were supported by Illinois law and the Policy.

¶ 41                           3. Cross-Motions for Summary Judgment

¶ 42 The parties cross-moved for summary judgment. For clarity and organization, we summarize Pan-Oceanic's motion for summary judgment around five issues as follows: (1) Conflict of Interest: an actual conflict existed from the moment punitive damages were added because Suber was paid by Grange, forced to defend both claims simultaneously, and the punitive exposure was unlimited and uninsured; (2) Waiver and Estoppel: by accepting the defense unconditionally and never reserving rights, Grange waived all policy defenses and is estopped from denying coverage because Pan-Oceanic was deprived of the ability to obtain independent counsel, settle, or shape the litigation; (3) Appeal Bond: the Policy's broad definition of "suit" as a civil proceeding encompassed appellate proceedings, and the appeal bond qualified as either a "bond to release attachments" or a "cost" of defense under the Policy's plain language; (4) Attorney fees: Grange breached the Policy's terms by refusing to pay Suber's invoices in full at a higher rate; and (5) Section 155: there was no *bona* fide dispute as Grange's obligations have been clear throughout this litigation.

¶ 43 Grange argued the following: (1) No Conflict of Interest existed because the amended complaint alleged identical negligence in both the compensatory and punitive counts, meaning a consistent defense of both was possible and no disparity of interest existed; (2) No Waiver or Estoppel: there was no requirement for Grange to reserve rights because the uninsurability of punitive damages rested on public policy rather than any policy term; (3) Appeal Bond: the appeal bond was neither a bond to release attachments under 735 ILCS 5/4-101 nor a cost taxed against the insured under Supreme Court Rule 374; and (4) Section 155: a *bona fide* dispute existed as to all issues, and Grange's positions were based on Illinois case law and Policy terms, which precluded Section 155 liability as a matter of law.

¶ 44                                  4. Circuit Court's Decision

¶ 45   In its July 23, 2024, order, the court (1) found a conflict of interest existed between Pan-Oceanic and Grange from the moment McQueen amended his complaint to include a request for punitive damages; (2) ordered Grange to pay attorney fees for the underlying defense, but not for any work related to the coverage litigation itself; (3) ruled that Grange was not estopped from denying coverage for punitive damages because Illinois public policy prohibits insurance coverage for punitive damages awarded for an insured's own misconduct; (4) held that under the Policy, Grange had no obligation to pay for the appeal bond premium because the Policy's language did not cover appeal bonds; (5) found that a *bona fide* dispute existed regarding the issues in the case, so there was no right to damages or penalties under Section 155 of the Insurance Code; and (6) awarded Pan-Oceanic prejudgment interest at a rate of 5% on those defense fees found to be due and owing by Grange, but not on amounts previously paid and returned.

¶ 46   On February 18, 2025, the court entered a written order that required Grange to reimburse Pan-Oceanic for the amount it paid Suber at his higher hourly rate, which totaled approximately $61,000. The court included language stating the order was final and appealable.

¶ 47   The parties cross-appealed.

¶ 48                                    II. ANALYSIS

¶ 49   Pan-Oceanic purports to bring eight issues on appeal, while Grange counters that the only issue is conflict of interest. Grange contends that a conflict of interest did not exist between it and Pan-Oceanic, meaning the circuit court erred in ordering Grange to reimburse Pan-Oceanic for Suber's higher attorney fees.

¶ 50   Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West

2022). "In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent." *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). "Where a reasonable person could draw divergent inferences from undisputed facts, summary judgment should be denied." *Parkside Senior Services, LLC v. National Development & Consultants, Ltd.*, 303 Ill. App. 3d 1022, 1024 (1999).

¶ 51     Pan-Oceanic's notice of appeal indicates that it seeks review of two written orders: the circuit court's July 23, 2024, order on the parties' cross-motions for summary judgment, as well as its February 18, 2025, order on attorney fees. We begin with the attorney fee issue, as its discussion is relevant for the issues that follow and provides crucial context for the other issues.

¶ 52                                A. Attorney Fees

¶ 53     The circuit court found that a conflict of interest existed between Grange and Pan-Oceanic, and it ordered Grange to reimburse Pan-Oceanic approximately $61,000 to fully cover Pan-Oceanic's legal expenses as to attorney Suber. As explained above, Suber increased his rate from $155 per hour to $350 per hour, which Pan-Oceanic paid, but Grange reimbursed Pan-Oceanic on the basis of the $155 hourly rate instead of $350 per hour. Grange now contends that there was actually no conflict of interest between it and Pan-Oceanic, so it does not have to pay Suber's higher fees. We disagree.

¶ 54     Generally, the insurer controls the defense once the insured has agreed to have the insurer defend it. *Nandorf, Inc. v. CAN Insurance Co.*, 134 Ill. App. 3d 134, 136 (1985). However, an exception to that rule applies if a conflict of interest arises between the insurer and insured. *Id.* at 137. In the event of a conflict between an insurer and the insured, the insured is entitled to select independent counsel (often referred to as "*Peppers* Counsel") whose reasonable fees the insurer

10

must pay, and the insurer may not control the insured's selection of counsel or counsel's fees. See *Maryland Casualty Co. v. Peppers*, 64 Ill. 2d 187, 194-196 (1976).

¶ 55    In other words, to determine whether an insured may choose independent counsel at the insurer's cost, there must first be a conflict of interest between the insurer and the insured. To determine whether a conflict of interest exists, we consider whether, in "comparing the allegations of the complaint to the policy terms, the interest of the insurer would be furthered by providing a less than vigorous defense to those allegations." *Nandorf*, 134 Ill. App. 3d at 136. A conflict of interest can exist where the underlying action asserts claims that are covered by the insurance policy and other causes which the insurer asserts are not covered by the policy. *Id.* at 138. A conflict may also arise where an insurer agrees to defend its uninsured while simultaneously disclaiming coverage for punitive damages. *Id.* Further, a conflict may exist where punitive damages form a "substantial portion" of the potential liability in the underlying action, such that the insured faces a greater risk in the litigation. *Xtreme Protection Services, LLC v. Steadfast Insurance Co.*, 2019 IL App (1st) 181501, ¶ 25. The substantial portion test is useful in cases where the pleadings specify the dollar amount of compensatory and punitive damages sought, such as in *Nandorf* and *Xtreme*. See *Xtreme*, 2019 IL App (1st) 181501, ¶ 29; *Nandorf*, 134 Ill. App. 3d at 135. Here, however, the pleadings do not provide such specificity, so deriving a ratio of compensatory to punitive damages is not possible, but that does not mean there was no conflict.

¶ 56    To determine whether a conflict existed where we do not have a specific amount of damages pleaded, we compare the allegations of the underlying complaint to the Policy terms to determine whether Grange's interest would be furthered by providing a less than vigorous defense. See *Nandorf*, 134 Ill. App. 3d at 137. We hold that, under the particular circumstances of this case, a conflict arose when McQueen added the (unspecified) punitive damages request in the

11

underlying action because at that point, Grange knew it would be responsible for compensatory damages only, while only Pan-Oceanic could be liable for any and all punitive damages.

¶ 57    Grange's and Pan-Oceanic's risks diverged the moment McQueen requested punitive damages, regardless of the fact that he did not specify the dollar amount, as the Policy language did not cover punitive damages.[2]

¶ 58    Illinois law does not limit the amount of punitive damages a jury may award.[3] Thus, Pan-Oceanic's exposure risk was difficult to assess because juries have the sole discretion to decide, without statutory limitation, what a fair and reasonable amount of punitive damages would be. This risk dynamic could have impacted Suber's decisions about every aspect of the case, including litigation strategy, discovery emphasis, settlement posture, and jury instruction requests. This carried potential consequences that cut differently for Grange than for Pan-Oceanic because of the potential for Pan-Oceanic to pay for punitive damages while Grange did not have an obligation to do so.

¶ 59    For instance, Pan-Oceanic, with the possibility of paying enormous punitive damages, may prefer to settle for a sum certain, while Grange may wish to proceed to trial, knowing that whatever happens, Pan-Oceanic would be responsible for punitive damages, and it would still only be responsible for compensatory damages. The risk between the parties was simply not aligned: Pan-Oceanic bore the bulk of the risk because given the conduct of Green's supervisor, punitive damages could be significant and yet difficult to estimate beforehand.

---

[2]See section B, *infra*, for our discussion on punitive damages coverage.

[3]See *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 444 (1997), holding that a statutory cap on punitive damages violated the separation of powers and the right to a jury trial under the Illinois Constitution. See also section B of this decision, *infra*.

¶ 60    Simply put, in this case, there are certain strategies that may have been more effective with only compensatory damages in mind, and other strategies that may be more effective when the concern about potentially paying punitive damages is one-sided. As such, Grange's retainer lawyer Suber prudently identified the conflict and fully informed the affected parties in writing.

¶ 61    Grange now argues that there was no conflict. This argument is unavailing, given that its own panel counsel, attorney Suber, identified the conflict and immediately communicated it to both Pan-Oceanic and Grange when it arose. On March 2, 2017, Suber sent an extensive letter to Grange's in-house counsel, noting the addition of punitive damages "increase[d] the risks associated with the case from the standpoint of the insured." Five days later, Suber also notified Pan-Oceanic of the conflict, in writing, and obtained Pan-Oceanic president's written consent to Suber's continued representation. There is no dispute as to any of this. Notwithstanding the foregoing, Grange now takes the position that a conflict did not exist. Not only was Grange aware of the conflict, but its own counsel identified it immediately at the time punitive damages were added in the underlying lawsuit. Grange cannot now take the opposite position, and as already discussed above, there was a conflict.

¶ 62    Because a conflict existed, Pan-Oceanic had the right to choose independent counsel at Grange's expense. See *Peppers*, 64 Ill. 2d 187, 194-95. At the time the conflict arose, Suber (Grange's own counsel) expressly identified the conflict and advised Pan-Oceanic and Grange, in detail, of the conflict's implications. Pan-Oceanic elected that Suber continue representing it, rather than seeking other counsel. Grange neither issued a reservation of rights nor clarified its coverage position, and it continued to fund the defense by increasing Suber's rate and without addressing the changed circumstances.

¶ 63    Grange now contends that it never agreed to an increase in Suber's hourly rate. While that may be true, an insurer cannot simultaneously preserve control over the defense, decline to clarify its coverage position, and then invoke its own fee schedule to limit compensation once a conflict has materialized. To hold otherwise would allow Grange to benefit from its inaction while depriving Pan-Oceanic of the contractual protections for which it has paid.

¶ 64    We note that the circuit court did not award fees wholesale. Rather, we see from the court's well-reasoned fee award order that the court carefully reviewed the billing records and awarded only those fees it found to be reasonable and attributable to the defense, ultimately arriving at the $61,662.80 figure. This measured approach confirms that the court did not simply endorse an increased rate in the abstract but instead ensured that the total fee award remained reasonable under the circumstances.

¶ 65    Accordingly, we affirm the circuit court's finding that a conflict existed, and its subsequent order requiring Grange to reimburse Pan-Oceanic $61,662.80 for Suber's higher attorney fees.

¶ 66                                B. Punitive Damages

¶ 67    Pan-Oceanic insists that Grange must pay for the $1,000,000 punitive damages award. This argument is without merit for several reasons.

¶ 68    First, just days after McQueen added a request for punitive damages, Suber reminded Pan-Oceanic that punitive damages were not insured under the Policy. Singh, Pan-Oceanic's president, signed a form that acknowledged that punitive damages are "not covered by the policy issued by Grange." Second, we find nothing in the plain language of the Policy that indicates coverage for punitive damages. Third, public policy generally prohibits insuring oneself against punitive damages. See *Bernier v. Burris*, 113 Ill. 2d 219, 246 (1986) ("In Illinois[,] one may not insure

against awards of punitive damages."). Pan-Oceanic contends that an exception to this general rule of public policy applies; we disagree.

¶ 69    Under *Scott v. Instant Parking, Inc.*, 105 Ill. App. 2d 133 (1969), an employer may insure against punitive damages arising solely from the conduct of its employees under principles of vicarious liability. *Id.* at 137. The reasoning is that in such a case the insured-employer has done no direct wrong; holding the employer's insurer liable does not frustrate the deterrent purpose against the actual wrongdoer. *Id.*

¶ 70    The key question here, therefore, is on which theory the jury based its award, which is not entirely clear from its verdict alone, which merely awarded punitive damages. If the award rested solely on Green's conduct and Pan-Oceanic's exposure was purely vicarious, the *Scott* exception may apply. If the award rested on Pan Oceanic's own corporate negligence, such as its failures in hiring, training, and supervision, then the public policy bar applies.

¶ 71    The amended complaint alleged that Pan-Oceanic itself "engaged in one or more of the following acts or omissions that demonstrated a reckless disregard for the safety of others." It listed failures in hiring, training, implementing policies, and authorizing Green to transport an unsafe load. Thus, Pan Oceanic's own direct misconduct, particularly its yard supervisor's decision to tell Green to accept the load, formed an independent basis for the punitive award.

¶ 72    This conclusion is consistent with both this Court's and the Illinois Supreme Court's reasoning in the underlying litigation, in which both courts rejected arguments that the verdicts were necessarily contradictory. Our supreme court reasoned that Pan-Oceanic could be found independently liable based on its own supervisory decisions independent of Green's conduct. *McQueen*, 2022 IL 126666, ¶ 51. That independent basis for liability defeats the argument that the punitive award rested solely on vicarious principles. To the extent any portion of the award may

have reflected vicarious exposure, the jury returned a general verdict on punitive damages without apportionment, and Pan-Oceanic bore the burden of establishing that the award was entirely vicarious in nature, which it has not done.

¶ 73    Pan-Oceanic correctly paid the $1,000,000 punitive damages award; thus, we do not disturb the circuit court's findings as to punitive damages.

¶ 74                                C. Appeal Bond Coverage

¶ 75    Pan-Oceanic argues the circuit court erred in its finding that the Policy did not cover the appeal bond premiums, which totaled approximately $89,000. Pan-Oceanic argues the Policy's supplementary payments provision encompasses appeal bonds. The provision provides, in relevant part, that the Policy covers "[t]he cost of bonds to release attachments in any 'suit' against the 'insured' [Grange] defend[s], but only for a bond amount within [its] Limit of Insurance" and "[a]ll costs taxed against the 'insured' in any 'suit' against the 'insured' [Grange] defend[s]."

¶ 76    Construction of an insurance policy is a question of law that we review *de novo*. *Illinois Insurance Guaranty Fund v. Nwidor*, 2018 IL App (1st) 171378, ¶ 16. Where the policy language is unambiguous, a court must give it its plain, ordinary meaning. *West Bend Mutual Insurance Co. v. Rosemont Exposition Services, Inc.*, 378 Ill. App. 3d 478, 486 (2007). Under the plain language of the Policy, for coverage to apply, an appeal bond would have to either be a "bond to release attachments" or a "cost taxed against" Pan-Oceanic (or both). However, an appeal bond is neither.

¶ 77    First, an appeal bond is not a "bond to release an attachment." An attachment is a *pre*judgment remedy by which a party's property is seized to secure a debt. 735 ILCS 5/4-101 (West 2024); *Hensley Construction, LLC v. Pulte Home Corp.*, 399 Ill. App. 3d 184, 190 (2010). An appeal bond, by contrast, is a *post*-judgment instrument filed to stay the enforcement of a judgment during appellate review. They differ in both time and function. Moreover, Article IV of

the Code of Civil Procedure governs attachments. See 735 ILCS 5/4-101 *et seq* (West 2024). The statute permits attachment only in specific enumerated circumstances, including those in which the defendant is a nonresident, has absconded, is about to remove property from the state, or has fraudulently conveyed property to defeat creditors. *Id.* None of these circumstances are present in appeal bonds. Because attachment bonds and appeal bonds differ in critical respects, we decline to read appeal bonds into the plain language of the Policy that refers only to "bonds to release an attachment."

¶ 78    Alternatively, Pan-Oceanic argues that the appeal bond premium qualifies as a "cost taxed against the insured." This argument is equally unavailing in light of our supreme court's decision in *Thornton*, in which the Court held that the "cost of an appeal-bond premium [is not an item of] cost allowable to a successful litigant in the absence of statute or agreement of the parties." *Thornton v. Illinois Founders*, 84 Ill. 2d 365, 373 (1981).

¶ 79    Based on the foregoing, we affirm the circuit court's ruling that Grange had no obligation to provide coverage for the appeal bond premiums.

¶ 80                                D. Section 155

¶ 81    Pan Oceanic argues that the circuit court erred in finding a *bona fide* dispute sufficient to preclude liability under section 155 of the Insurance Code. 215 ILCS 5/155 (West 2024).

¶ 82    Section 155 allows a policyholder to recover attorney fees and other monetary compensation, including litigation costs and statutory fees, where an insurance company delays paying a claim. *Id.* 5/155(1). The delay must be "vexatious and unreasonable" to prevail. *Id.* A delay is not "vexatious and unreasonable" where a *bona fide* dispute over coverage exists. See, *e.g.*, *Baxter International, Inc. v. American Guarantee & Liability Insurance Co.*, 369 Ill. App. 3d

700, 710 (2006); *State Farm Mutual Automobile Insurance Co. v. Smith*, 197 Ill. 2d 369, 377-78 (2001).

¶ 83 Here, the parties' dispute presents the type of dispute that defeats Section 155 liability. As evidenced throughout this litigation, the issues of conflict of interest, independent counsel, and the scope of the insurer's coverage are all debatable legal questions. The underlying complaint itself did not present a clear or disproportionate punitive damages exposure, and the allegations supporting negligence and punitive damages substantially overlapped. At a minimum, these circumstances establish a *bona fide* dispute as to coverage and defense obligations, which, as a matter of law, precludes a finding that the insurer acted vexatiously or unreasonably. Accordingly, Section 155 relief is unavailable.

¶ 84                                             III. CONCLUSION

¶ 85 For these reasons, we affirm the judgments of the circuit court of Cook County.

¶ 86 Affirmed.