SWEDISHAMERICAN HOSPITAL ASSOCIATION OF ROCKFORD *et al.*, Plaintiffs-Appellants, v. ILLINOIS STATE MEDICAL INTER-INSURANCE EXCHANGE, Defendant-Appellee.

Second District   No. 2—08—0136

Opinion filed September 18, 2009.

82

Richard K. Van Evera and Charlotte A. LeClercq, both of Barrick, Switzer, Long, Balsley & Van Evera, LLP, of Rockford, and Michael M. Marick and Rebecca R. Haller, both of Meckler Bulger Tilson Marick & Pearson LLP, of Chicago, for appellants.

James J. Stamos, of Stamos & Trucco LLP, of Chicago, for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Plaintiffs, SwedishAmerican Hospital Association of Rockford (Hospital) and Sari Insurance Company, individually and as subrogees of Dr. Bruce Hecht, appeal the trial court order that granted summary judgment in favor of defendant, Illinois State Medical Inter-Insurance Exchange (ISMIE). On appeal, plaintiffs argue that the trial court erred in determining that the "no action" clause in defendant's insurance policy was enforceable and barred plaintiffs' recovery under the policy. ISMIE relied on the no-action provision when it refused to contribute its policy limit toward a settlement agreement that plaintiffs entered in a medical-malpractice lawsuit that was filed against them. Plaintiffs argue that ISMIE breached its good-faith duty to settle the medical-malpractice lawsuit and cannot rely on the no-action provision in its policy. We affirm in part, reverse in part, and remand.

## I. BACKGROUND

This case stems from an underlying medical-malpractice lawsuit filed by the family of an infant that was treated by Dr. Hecht at the

Hospital in Winnebago County. The lawsuit was filed under No. 95—L—91 as Tripp v. SwedishAmerican Hospital and Bruce Hecht. We refer to this as the *Tripp* suit. Dr. Hecht joined the Hospital on June 1, 1993. In December 1993, Dr. Hecht treated an infant, Wanique Tripp, for cardiac problems. Dr. Hecht performed a cardiac biopsy on the child in December 1993 that allegedly resulted in the child's disabling and disfiguring spastic quadriparesis. The *Tripp* lawsuit was filed against the Hospital and Dr. Hecht in March 1995 and alleged that Dr. Hecht was negligent and that the Hospital was vicariously liable for his negligence. The case was tendered to ISMIE, which accepted and defended Dr. Hecht without a reservation of rights. ISMIE provided $1 million coverage for Dr. Hecht, the Hospital self-insured $1.5 million for itself and its employees, and Sari provided a $25 million excess policy, covering the Hospital and its employees. Greg Snyder represented Dr. Hecht; ISMIE paid for Snyder's services. The Hospital was defended by separate counsel, David Faulkner. Additionally, ISMIE advised Dr. Hecht to seek private counsel to advise him separately, which he did when he hired Paul Cicero.

After extensive discovery, the case settled on May 15, 2003, for $5 million. However, ISMIE refused to participate in the settlement and refused to pay on its $1 million policy. The structured settlement agreement stated that the Hospital and its insurer agreed to pay $3 million immediately and the remaining $2 million in a periodic payment plan. In exchange, the *Tripp* lawsuit against the Hospital and Dr. Hecht would be dismissed with prejudice. The trial court approved the settlement agreement on June 11, 2003. On July 28, 2003, Dr. Hecht assigned to the Hospital and Sari his right to recover the $1 million from ISMIE. In the assignment agreement, Dr. Hecht denied the allegations in the *Tripp* lawsuit and stated that he tendered his defense to ISMIE. ISMIE assigned defense counsel to represent Dr. Hecht. After discovery was substantially completed, Dr. Hecht determined that it would be in his best interests to settle the litigation. ISMIE refused to contribute or participate in the settlement agreement. Dr. Hecht was required by the Hospital and Sari policies to cooperate with them in the subrogation of any payment made under their plans on his behalf.

On October 27, 2003, plaintiffs filed suit against ISMIE, seeking recovery of the $1 million ISMIE policy limit. The amended complaint alleged ISMIE's lack of good faith under various theories: two counts of Dr. Hecht's right to select coverage; one count of equitable contribution; one count of reimbursement; one count of unjust enrichment; and one count of *quantum meruit*. We delineate these counts in greater detail later in this opinion. On June 12, 2006, plaintiffs filed a motion

for summary judgment pursuant to section 2—1005 of the Code of Civil Procedure (Code) (735 ILCS 5/2—1005 (West 2006)). Plaintiffs argued that the undisputed facts demonstrated that ISMIE had an obligation to contribute to the settlement of the *Tripp* lawsuit and failed to fulfill that obligation. They also claimed that ISMIE was liable for costs under section 155 of the Illinois Insurance Code (215 ILCS 5/155(1) (West 2002)). In support of its motion, plaintiffs attached multiple documents, which we describe as follows.

An affidavit from Richard Walsh, chief operating officer of the Hospital, provided that he authorized the settlement for both the Hospital and Dr. Hecht. The Hospital purchased the ISMIE policy to provide primary coverage for Dr. Hecht. ISMIE acknowledged that its policy provided primary coverage for Dr. Hecht, and it defended him without a reservation of rights. The evidence in the *Tripp* lawsuit indicated that there was a high probability that a verdict would result against Dr. Hecht and that it would greatly exceed the $1 million ISMIE policy limit.

Answers to plaintiffs' interrogatories were also attached to the motion. ISMIE admitted that it defended Dr. Hecht without a reservation of rights but denied that there was a reasonable probability of a verdict against Dr. Hecht. ISMIE admitted that in early 2003 Dr. Hecht demanded settlement, but it denied that it was required to pursue settlement on his behalf. ISMIE admitted that plaintiffs settled for the release of Dr. Hecht and the Hospital, but it stated that it had insufficient knowledge to determine what was paid for Dr. Hecht's and the Hospital's release individually.

A portion of Jennifer Temple's deposition was attached as an exhibit. Temple, ISMIE's claims manager, testified that normally if a hospital were sued under a vicarious-liability theory, the hospital's insurance would pay after the doctor's limits were exhausted. She admitted that ISMIE agreed to pay first dollar in the event of a verdict against Dr. Hecht. Temple recommended that the suit be defended and acknowledged that Dr. Hecht wanted to defend the suit, but she admitted that she had noted that the Hospital was under pressure to settle from its excess carrier (Sari). In Temple's notes from 2002, she indicated that she felt the chance of prevailing in front of a jury of lay-people was 50/50 at best because of the technical medical issues involved. In front of a jury of doctors, Dr. Hecht would have a 95% chance of prevailing. She stated in her notes that she was "very worried about the potential exposure," and that a verdict would likely be in the millions of dollars. Temple wrote that from ISMIE's perspective, its $1 million was gone whether the case was tried or settled, because a verdict or a settlement would likely be more than $1 mil-

lion. She wrote, "[t]herefore, by trying this case, we have a chance to theoretically 'win back' our $1mil." Temple wrote this in summary of her conversation with Dr. Hecht advising him of ISMIE's position that the case was medically defensible but that he should consult with private counsel as he would have concerns of liability beyond ISMIE's $1 million. She admitted that after Dr. Hecht discussed the case with private counsel, he wanted to settle the case and that Temple agreed to recommend to the physician review committee that the case should be settled. In her report to the physician review committee, Temple admitted that there were problems with the defense of Dr. Hecht, including that he was a "loose cannon" at times and that the plaintiff would make a sympathetic witness.

On November 13, 2002, the physician review committee decided that the case should be tried. Temple attended the meeting and recalled that they considered Dr. Hecht's desire to settle but that the physicians believed it was a defensible case. Temple admitted that defense counsel conducted one-day focus groups, which all ended in verdicts against Dr. Hecht. Temple acknowledged that defense counsel did the best it could given the fact that they condensed what would have taken three weeks into one day. However, ISMIE believed that its expert was a stronger witness and that over three weeks' time, jurors would understand the technical medical issues involved. The average verdict from the focus groups was $20 million. Later, Temple received a letter from Dr. Hecht in which he expressed concern about having to close his office for three weeks for a trial and that he would prefer not to do that. Although Temple believed that Dr. Hecht wanted to defend the case, she admitted that in April 2003 correspondence she indicated that Dr. Hecht wanted to settle because he was concerned about his exposure and that a large verdict could bankrupt his medical practice. Temple testified that ISMIE was not concerned about Dr. Hecht's concerns but also that ISMIE was not making its decision based on its financial interests. According to Temple, if ISMIE felt it had a medically defensible case, it would try the case "regardless of any financial considerations to the company."

Temple admitted that the Hospital could not settle *only* on its own behalf but would also have to settle on Dr. Hecht's behalf because its policy covered the doctor and it was being sued solely based on vicarious liability. The Hospital invited Temple to attend a mediation with the plaintiff in the *Tripp* matter, and Temple attended though she had no settlement authority. The plaintiff had demanded $9 million. Temple acknowledged that she knew the resulting settlement agreement had released Dr. Hecht from liability.

A portion of Daniel Saunders' deposition contained the following. Saunders, ISMIE's claims vice president, testified that he was aware that the Hospital was a codefendant in the *Tripp* lawsuit and that the Hospital was being sued under a vicarious-liability theory. He acknowledged that ISMIE agreed not to seek contribution from the Hospital until ISMIE's policy limits were exhausted in the event that a settlement or a verdict exceeded those limits. While he admitted that he did not think it was unreasonable for the Hospital to settle the case, ISMIE's physician review committee recommended that it proceed to trial because it felt that it could win. Karen Tellers, an ISMIE claims manager, testified that she acknowledged in a memo that the ISMIE policy would pay first dollar since the Hospital had been named only on a vicarious-liability theory. She admitted that she and Temple agreed that the lawsuit against Dr. Hecht, while medically defensible, had a high verdict potential. She admitted that after Dr. Hecht indicated that he wanted to settle the case, she and Temple recommended to the physician review committee that the case be settled. Tellers also admitted that Dr. Hecht could be a poor witness because of his uncontrollable animosity toward the plaintiff's attorney. When the Hospital asked ISMIE to tender the policy so that it could settle the case, Tellers noted that ISMIE would defend the case.

A letter from Temple, dated December 21, 2001, and addressed to Faulkner, stated that the letter was confirming that "ISMIE will agree to pay the first dollar in any verdict awarded the plaintiff up to Dr. Hecht's policy limits." Plaintiffs also attached Temple's memo to the physician review committee dated October 25, 2002, in which she requested review because Dr. Hecht requested that ISMIE settle the case. Her letter stated that the plaintiff was a sympathetic witness and that Dr. Hecht was a "loose cannon." She wrote that while the case was medically defensible, there was a high verdict exposure. Temple's recommendation for the claims department for ISMIE stated:

> "Dr. Hecht has asked that this case be placed in settlement posture on his behalf. Given the potential verdict exposure and the risk to Dr. Hecht's practice, defense counsel and the claims department also recommend that settlement be considered."

Copies of claims notes are attached that indicate that in November 2002, Dr. Hecht wanted the case to settle and was concerned about the verdict potential as he now owned his own practice. He was also concerned about the publicity of the case. Another note dated December 5, 2002, also indicated that Dr. Hecht desired settlement. Again, a note in March 2003 indicated that Dr. Hecht was having his personal attorney send a letter demanding settlement and that plaintiffs were likely going to demand settlement also. Temple

indicated that the case was medically defensible but she was concerned about whether the jury would be able to understand the medicine involved and about Dr. Hecht's composure. On April 1, 2003, Temple wrote that she spoke with Dr. Hecht and he was very concerned about the high verdict potential, wanted the case settled, and was concerned about losing his practice if the case were lost at trial. Temple agreed to attend the mediation but would not have any authority to settle. However, her objective was to listen to the parties' positions and ISMIE could decide how to proceed after the mediation. Temple then wrote:

> "This morning we finally received a letter from the hospital confirming that they also insure Dr. Hecht. This places us in a more favorable position. Given this confirmation, they cannot settle this case without protecting the interests of Dr. Hecht. As such, they would not be able to settle the case on their own and then we proceed to trial with only our $1m policy and even more exposure."

After the mediation, Temple wrote on April 3, 2003, that the case was not resolved and that the plaintiff demanded $9 million. She wrote that if "the hospital is confident that ISMIE's $1m must be tendered, then they can settle the entire case now and attempt to resolve their differences with ISMIE after the fact."

An affidavit from Faulkner stated that ISMIE never raised an objection to his negotiations that led to the settlement. Faulkner believed the case should be settled and wrote Temple an extensive letter indicating his reasons for his belief, including the focus group feedback, the fact that Dr. Hecht did not perform the cardiac biopsy on earlier occasions when the infant was seen with similar symptoms, and that there was some evidence that the biopsy would not have changed the course of treatment, was unnecessary, and could have been performed at another time. The average damages award was $20 million. A copy of Faulkner's letter to Temple was attached as an exhibit to his affidavit, along with the focus group data. The focus group data demonstrated that many of the mock jurors found Dr. Hecht to be an unfavorable witness, felt that the biopsy did not need to be performed at a time when the patient was in such bad cardiac distress, and felt the doctor was in a rush to perform the biopsy. The damages that the jurors provided on an individual basis ranged from $0 to $75 million. After deliberations, one jury awarded $32 million and another awarded $12 million.

A letter from Dr. Hecht's private counsel, Paul Cicero, dated March 26, 2003, and addressed to Temple, indicated Dr. Hecht's desire to settle the matter and demanded that ISMIE tender its policy for settlement. A letter from Greg Snyder, Dr. Hecht's counsel paid by ISMIE,

dated March 24, 2003, and addressed to Temple, also indicated that Dr. Hecht wished to settle the matter. A letter from Richard Walsh dated April 3, 2003, reiterated the Hospital's and Sari's request that ISMIE settle and tender the policy because they strongly believed that damages would be awarded and would be far greater than $1 million. Walsh cited to the factors that justified settlement: the catastrophic nature of the infant's injuries, the feedback from two focus groups that found in favor of the infant, the focus groups' negative reaction to Dr. Hecht, the focus groups' beliefs that the biopsy did not need to be performed at the time it was done, that ISMIE's expert was not the strongest witness, and that the plaintiff's attorney was one of the top 10 litigators in the country and known for obtaining multimillion dollar verdicts. Walsh stated that under Illinois law, the primary insurer has a duty to its insured and its excess insurers to act in good faith and that ISMIE's failure to settle, in hopes of saving $1 million but at the potential expense of the other insurers, was a breach of that duty.

A portion of the deposition of Dr. Richard Friedman was attached to plaintiffs' motion. Dr. Friedman acknowledged that the cardiac biopsy would not have altered the course of treatment for Wanique. Wanique was being treated for active myocarditis. There was no firm diagnosis as to the etiology of her cardiomyopathy, so the biopsy would have assisted the treating physician in determining whether Wanique's condition was an active inflammatory process or whether the heart was severely damaged to the point where other therapeutic options needed to be considered. Typically, five to seven biopsies are needed to obtain a diagnosis when a patient presents with cardiomyopathy. This was the first biopsy performed on Wanique. The biopsy was negative, but Dr. Friedman acknowledged that even if it had come back positive for active myocarditis, the treatment Wanique was receiving would have been the same. In most cases, after an episode of myocarditis, cardiac function returns to normal. When Wanique was discharged, her cardiac function had returned to normal. Dr. Friedman could not be certain whether Wanique had myocarditis.

A portion of Dr. Hecht's deposition was attached. Dr. Hecht explained that before the biopsy, he did not know if Wanique had an active inflammation in the heart muscle. The negative biopsy told him that there was no active inflammation in the heart and that improvement in active inflammation was not the reason for the improvement in the size of Wanique's heart, which was enlarged at the time of her admission. The reason for the improvement in her heart size was the medications that he was administering to improve the force of the heart contractions. Dr. Hecht admitted that the prednisone that Wanique was receiving upon admission on December 13 also could

have improved myocarditis, if Wanique had that condition upon admission. Dr. Hecht admitted that he could have waited a few days after December 21 to perform the biopsy.

On April 4, 2003, attorneys for the *Tripp* plaintiff, the Hospital, and Dr. Hecht appeared in court to present it with their settlement agreement. The Hospital and Sari would pay the plaintiff $5 million but reserved their rights against ISMIE. A letter from the Hospital's counsel dated September 8, 2003, and addressed to ISMIE requested that ISMIE contribute $1 million toward the settlement and stated that if it refused, the Hospital would file suit. ISMIE responded by letter dated September 16, 2003, in which it stated that it maintained a defense posture and refused to contribute toward the settlement.

Finally, plaintiffs attached copies of the physician services agreement and the relevant policies, which we will discuss in greater detail when needed in our analysis. The physician review committee recommendations are also contained in the record by reference in various claims notes. The committee recommended that the case be defended and not settled on October 8, 1997, February 13, 2002, November 13, 2002, and again on September 10, 2003, after the settlement agreement was reached. However, it is unclear whether there was a dispute between Dr. Hecht and ISMIE preceding the 1997 and February 2002 referrals to the physician review committee, as the claims letters are not contained in the record.

On June 14, 2006, ISMIE filed a cross-motion for summary judgment, making multiple arguments as to why it was not required to contribute. First, ISMIE argued that plaintiffs' claim violated the no-action provision of ISMIE's policy, which provided that no action could be brought against ISMIE unless there was either a judgment after a trial or a written agreement with ISMIE. Second, ISMIE claimed that its provision regarding disputes to settle prohibited plaintiffs' recovery, because that provision required ISMIE to have disputes settled by its physician committee. In this case, the committee recommended proceeding to trial. Third, ISMIE argued that the payments made by plaintiffs were voluntary payments that ISMIE did not authorize and thus was not required to contribute toward, as its policy provided that the insured shall not voluntarily make any payment, assume any obligation, or incur any expense. Fourth, ISMIE argued that plaintiffs could not prove the necessary elements of a contribution claim, because they could not prove that Dr. Hecht was negligent. Fifth, Dr. Hecht was not covered by the Hospital and Sari policies, because they excluded coverage for "personal acts or omissions involving a Medical Incident," and Dr. Hecht had personally performed the cardiac biopsy. Sixth, the payments made in the settlement were on behalf of the

Hospital and not Dr. Hecht, because the payments were not stated to be made on behalf of Dr. Hecht. Seventh, because the Hospital policy provided $1.5 million of primary coverage, the Hospital was not injured by ISMIE's failure to pay. Finally, Dr. Hecht had no claim to assign since ISMIE did not violate its contract with Dr. Hecht.

On August 29, 2006, the trial court heard the parties' arguments and continued the matter so it could consider the motions. During arguments, plaintiffs presented their theory that ISMIE breached its good-faith duty to settle and thus was required under its policy to pay the $1 million toward the settlement that plaintiffs eventually effectuated on their own. Plaintiffs argued that ISMIE could not rely on its no-action clause when it had breached its duty to settle. Plaintiffs further argued that ISMIE's conduct in failing to settle violated section 155 of the Insurance Code. ISMIE made much the same arguments it makes on appeal in its defense. For example, ISMIE argues that in all of the cases where an insurer was held to have breached a duty to settle, the insurer also breached its duty to defend. ISMIE had defended Dr. Hecht from the beginning and had never denied coverage, and thus, ISMIE could not be forced to pay a settlement to which it never agreed. ISMIE also pointed out in its argument that this was not a claim for bad-faith refusal to settle, because Dr. Hecht had no such claim and therefore such a claim could not be subrogated or assigned. ISMIE then asked the court, "if Your Honor thinks that there is not a question of fact, if that issue were relevant, we would ask leave to file a sur-reply that lays out the facts that show the alternative facts that have to be considered" because ISMIE had not responded to plaintiffs' factual allegations as to why the case should have settled. After several continuances, the trial court issued the following memorandum of its decision on January 7, 2008:

"I have read the cases I wished to read and have studied the arguments of the parties.

My primary finding is that the so called 'no action' provision of the policy controls for the reasons elucidated in [ISMIE's] brief. Additionally, I concur with [ISMIE's] argument that contribution does not lie because liability has not been unequivocally established by trial or agreement of the parties. I also believe that the additional language of the policy denies obligation to reimburse payment made, even if shown to be on behalf of the doctor if done so involuntarily.

For these reasons and others not articulated by the Court, I find for the Defendant, ISMIE, and ask [counsel] to draft the order."

Inexplicably, on March 25, 2008, the trial court issued another memorandum, which provided in relevant part:

"I have read the cases I was unable to get to originally, most specifically the case of *Royal Globe Insurance v. Aetna*. I have been through the briefs and my notes of the oral arguments several times and have come to the conclusion that the defendant must prevail on the cross motions for summary judgment.

I believe the 'No Action' provision of the policy controls and is enforceable. It states that no action may lie until the insured's obligation is finally determined by judgment after trial or by a written contract between the parties. Neither of these has occurred. ISMIE steadfastly and perhaps stubbornly clung to its defensive posture throughout the process.

In order for the hospital to prevail under these circumstances they must prove all facts necessary to claimant's recovery in the underlying case against the insured. They have not done this.

Where contract language controls the rights of the parties there is no occasion to enforce equity."

On February 14, 2008, plaintiffs timely appealed the grant of summary judgment in favor of ISMIE.

## II. ANALYSIS

█ Initially, we admonish plaintiffs that a statement of facts should be void of argument per Supreme Court Rule 341(h)(6) (210 Ill. 2d R. 341(h)(6)). Much of plaintiffs' facts violates Rule 341(h)(6) and contains argument. We strike and ignore those portions of plaintiffs' facts. Moving on to the merits, plaintiffs make several arguments on appeal. First, plaintiffs argue that ISMIE's $1 million policy was purchased by the Hospital to cover the first $1 million of the Hospital's $1.5 million self-insured limit. On that premise, plaintiffs argue that the Hospital is entitled to recover ISMIE's $1 million: (1) based on the principle of equitable contribution because both the Hospital plan and the ISMIE plan covered Dr. Hecht; (2) because of the subrogation provision in the Hospital's policy; (3) based on the principles of unjust enrichment; and (4) based on *quantum meruit*. Plaintiffs further argue that ISMIE's position is erroneous because: (1) plaintiffs' payments were not voluntary; and (2) neither the no-action provision nor its other-policy provisions defeat plaintiffs' claims against ISMIE, because ISMIE breached its good-faith duty to settle. Plaintiffs argue that if we do not believe that the ISMIE policy covered $1 million of the Hospital's $1.5 million self-insured limit, then Sari is entitled to recover from ISMIE on theories of equitable and contractual subrogation, horizontal exhaustion, unjust enrichment, and *quantum meruit*. Further, plaintiffs' payments were not voluntary and the no-action and other-policy provisions do not defeat Sari's claims against ISMIE, because ISMIE breached its good-faith duty to settle. Finally, plaintiffs

argue that ISMIE owes interest on the $1 million from the date the amount became due under section 2 of the Interest Act (815 ILCS 205/2 (West 2006)), and costs and other relief under section 155 of the Insurance Code.

A motion for summary judgment is properly granted when the pleadings, depositions, admissions, and affidavits on file establish that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2006); *Chatham Foot Specialists, P.C. v. Health Care Service Corp.*, 216 Ill. 2d 366, 376 (2005). When ruling on a motion for summary judgment, the court has a duty to construe the evidence in the light most favorable to the nonmoving party and strictly against the movant. *Chatham Foot*, 216 Ill. 2d at 376. Summary judgment is a drastic measure of disposing of litigation and should be granted only if the movant's right to judgment is clear and free from doubt. *Chatham Foot*, 216 Ill. 2d at 376. Our review of summary judgment rulings is *de novo*. *Chatham Foot*, 216 Ill. 2d at 376.

### A. The Hospital's Equitable Contribution Claim

■ The logical place to begin our analysis is deciding whether ISMIE's policy covered $1 million of the Hospital's self-insured $1.5 million plan, as plaintiffs argue. If ISMIE's policy was not covering $1 million of the Hospital's self-retained $1.5 million limit, the Hospital was not injured by ISMIE's failure to contribute because, regardless of ISMIE's payment, the Hospital would have owed $1.5 million toward the $5 million settlement, not $500,000 as it contends. The Hospital policy, known as the SwedishAmerican Hospital Association Hospital Professional Liability and Comprehensive General Liability Self-Insurance Plan Claims Made Coverage (hereafter the SIR policy), provided $1.5 million for professional liability coverage for the Hospital and its employees.

An insurance policy is a contract and its construction is a question of law, which we review *de novo*. *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 174 (2008). If the words used in the contract are unambiguous, we must give them their plain and ordinary meaning. *Barth*, 228 Ill. 2d at 174. When a contract is unambiguous, courts must not consider any evidence beyond the four corners of the contract when construing the contract. *Allstate Insurance Co. v. Amato*, 372 Ill. App. 3d 139, 143 (2007). In this case, neither the SIR policy nor the ISMIE policy contains any provision that indicates that the first $1 million of the SIR limit was to be paid by the ISMIE policy. Neither the Hospital nor ISMIE refers to any policy addendum that otherwise suggests that the SIR policy was truly providing only $500,000 of

coverage. In fact, the SIR policy defines a "covered party" as "any employed physician *** while acting within the scope of their duties *** provided that the physician shall maintain in full force and effect Physicians' Professional Liability insurance for limits of not less than $1,000,000 each medical incident/$3,000,000 aggregate. These limits may be self-insured and maintained by the Named Cover Party or insurance may be purchased with respect to all or part of these limits." This provision does not indicate that the purchased policy was somehow meant to reduce the limit provided in the SIR policy to $500,000. The SIR policy clearly provides that regardless of the number of covered parties or claims made, the SIR liability limit was $1.5 million for each medical incident. Because the policies are unambiguous on this point, we need not and must not consider any evidence beyond the policies. Thus, we reject the Hospital's argument that ISMIE's policy was intended to cover the first $1 million of the SIR policy's self-insured limit and that the Hospital overpaid $1 million toward the settlement. In doing so, we reject count III of the complaint, which alleged equitable contribution, as the Hospital was not harmed by ISMIE's failure to contribute $1 million toward the settlement.[1] See *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 316 (2004) ("Contribution as it pertains to insurance law is an equitable principle arising among coinsurers which permits one insurer who has paid the entire loss, or greater than its share of the loss, to be reimbursed from other insurers who are also liable for the same loss"). Therefore, the trial court properly granted summary judgment in favor of ISMIE as to count III of the complaint. We now turn to the remainder of the claims.

## B. The Policies

The Sari policy covered the Hospital and its employees, providing excess coverage up to $25 million, and contained the standard provision requiring that all primary insurance limits be exhausted prior to any excess payments being made. The policy specifically covered "any employed physician of the named insured while acting within the scope of their duties for the named insured."

The ISMIE policy listed Dr. Hecht as a named insured and the Hospital as a certificate holder of the policy, as it is undisputed that

_____

[1]On July 15, 2009, plaintiffs moved to cite *Federal Insurance Co. v. Binney & Smith, Inc.*, 393 Ill. App. 3d 277 (2009), in support of their position that Dr. Hecht need not prove that he was actually negligent. This motion went unopposed. We grant plaintiffs' motion. Since we affirm summary judgment on the contribution claim, we will consider *Federal Insurance* where relevant in the remainder of our analysis.

the Hospital purchased the policy for Dr. Hecht in the amount of $1 million. According to the policy:

> "The Exchange will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as **damages** because of any claim or claims first made against the insured during the **policy period** because of **personal injury** arising out of the rendering of or failure to render, on or after the **retroactive date, professional services** in the practice of the **named insured's** profession as a physician:
>
> (1) by the **named insured,** or
>
> (2) by any person for whose acts or omissions the **named insured** is legally responsible subject to the terms, conditions, exclusions and limits contained in this policy." (Emphases in original.)

The conditions of the ISMIE policy contained the following provision under the section relating to the insured's duties in the event of a personal-injury claim or suit:

> "(d) The Exchange will not settle any claim or **suit** without having first obtained the written consent of the **named insured**. If the **named insured** and the Exchange are in disagreement as to whether or not a claim or **suit** should be settled or defended, either party may request that the matter be submitted to a committee of physician members of the Exchange whose decision regarding disposition of the claim or **suit** shall be binding." (Emphases in original.)

The no-action provision provided in relevant part:

> "No action shall lie against the Exchange unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the Exchange."

The SIR policy insured the Hospital and its employees while acting within the scope of their duties for the Hospital, up to $1.5 million. The policy did not apply to "liability of a Covered Party, if an individual, for such Covered Party's personal acts or omissions involving a Medical Incident."

### C. The Complaint

In their complaint, plaintiffs alleged in their facts that under the circumstances, ISMIE had a duty to pursue settlement on Dr. Hecht's behalf in the *Tripp* lawsuit and to offer an amount, up to and including the full $1 million limit of the policy, in an attempt to settle. Plaintiffs further alleged in the facts of the complaint that the settlement was a reasonable sum given the likelihood that Dr. Hecht would

be found liable and the likelihood that a jury would award very high damages.

The causes of action posed in the complaint include plaintiffs' claim, as Dr. Hecht's assignees, of their right to select coverage (count I of the complaint). The right-to-select-coverage claim alleged that: (1) the amount paid to the *Tripp* plaintiff was reasonable and paid on the basis that it was reasonably likely that Dr. Hecht would be found liable in the lawsuit; (2) Dr. Hecht rightfully selected ISMIE's coverage to apply the first $1 million of the settlement amount; (3) ISMIE was obligated to pay the $1 million; and (4) as Dr. Hecht's assignees, plaintiffs were entitled to recover the $1 million. Similarly, plaintiffs alleged the same facts to support count II, which was based on plaintiffs' right as subrogees of Dr. Hecht. In count IV, Sari alleged the same facts to support its claim that ISMIE owed the $1 million under the doctrines of horizontal exhaustion, as recognized in *Missouri Pacific R.R. Co. v. International Insurance Co.*, 288 Ill. App. 3d 69 (1997), and reimbursement, as provided in *Schal Bovis, Inc. v. Casualty Insurance Co.*, 315 Ill. App. 3d 353 (2000) (*Schal Bovis II*).[2] In count V, plaintiffs alleged that they were entitled to recovery for unjust enrichment because ISMIE was enjoying the benefit of the settlement without making payment. In count VI, plaintiffs alleged that they were entitled to recovery based on *quantum meruit* because ISMIE was enjoying the benefit of the settlement without objecting to entry of the settlement. Plaintiffs argue that the provisions raised by ISMIE in its defense are inapplicable where ISMIE has breached its good-faith duty to settle.

Typically, breach of a good-faith duty to settle is a tort claim that arises from a contractual obligation.[3] *Chandler v. American Fire & Casualty Insurance Co.*, 377 Ill. App. 3d 253, 255 (2007) ("Any bad-faith failure to settle would be a tort arising from this contractual obligation"); *Schal Bovis I*, 314 Ill. App. 3d at 574 ("A complaint for bad faith sounds in tort and is subject to all of the requirements of a traditional negligence complaint"). However, plaintiffs admitted during oral arguments that they intentionally did not plead a tortious breach of a good-faith duty to settle the claim and were not seeking

---

[2]We refer to this case as *Schal Bovis II* to distinguish it from *Schal Bovis v. Casualty Insurance Co.*, 314 Ill. App. 3d 562 (1999) (*Schal Bovis I*), for the sake of clarity.

[3]On July 17, 2009, ISMIE moved for leave to cite to *Schal Bovis I* and *McLean v. Rockford Country Club*, 352 Ill. App. 3d 229 (2004), for its position that plaintiffs failed to plead a tort claim for breach of a good-faith duty to settle, which motion went unopposed. We grant the motion.

tort damages. Rather, they merely sought the $1 million owed under the ISMIE contract by pleading other causes of action, including equitable subrogation, and alleging the necessary facts to support its claim that ISMIE breached its good-faith duty to settle under the contract. Plaintiffs' method of pleading is not barred, as courts have also recognized the good-faith duty as one implied in the insurance contract and capable of being raised in claims such as equitable subrogation. See *Twin City Fire Insurance Co. v. Country Mutual Insurance Co.*, 23 F.3d 1175, 1181 (7th Cir. 1994); *Liberty Mutual Insurance Co. v. American Home Assurance Co.*, 348 F. Supp. 2d 940, 960-61 (N.D. Ill. 2004). Thus, we limit our review to plaintiffs' contractual claims as pleaded.

### D. Effect of No-Action Provision

We first address ISMIE's defense that its no-action provision is enforceable because ISMIE did not breach its duty to defend Dr. Hecht.[4] In granting summary judgment for ISMIE, the trial court essentially accepted ISMIE's position that the no-action provision barred plaintiffs' recovery regardless of whether it acted in bad faith (or perhaps the trial court determined that ISMIE acted in good faith, without discussing or mentioning the issue). The purpose of a no-action provision is to protect the insurer from collusive or overly generous or unnecessary settlement by the insured at the expense of the insurance carrier. *DeLuxe Motor Stages of Illinois, Inc. v. Hartford Accident & Indemnity Co.*, 88 Ill. App. 2d 188, 193 (1967). "It is, however, unfair to the insured to enforce the clause against him when the insurer has erroneously refused to perform the insurance contract." *DeLuxe*, 88 Ill. App. 2d at 193. While in *DeLuxe* the insurer had refused to defend and thus breached the insurance contract by failing to defend where coverage was provided, it follows that it would

---

[4]Plaintiffs state in their brief that ISMIE waived its right to rely on its no-action provision because it neither asserted it in a reservation of rights against Dr. Hecht nor pleaded it as an affirmative defense. We reject plaintiffs' argument, as ISMIE raised the no-action provision in its motion for summary judgment, and further, we cannot say that plaintiffs would be surprised by ISMIE's reliance on a provision in the very contract that plaintiffs are attempting to enforce. See 735 ILCS 5/2—613(d) (West 2008) (facts constituting an affirmative defense must be plainly set forth in the answer or reply if such defense, if not expressly stated, would take the opposite party by surprise). Further, because a motion for summary judgment may be filed at any time, even prior to filing an answer, an affirmative defense raised in such a motion may be considered even if not raised in the answer. *Salazar v. State Farm Mutual Automobile Insurance Co.*, 191 Ill. App. 3d 871, 876 (1989).

be unfair to enforce the no-action clause against the insured where the insurer has similarly breached the contract by breaching the duty to settle. In fact, the supreme court has stated that "[a]n insurer who undertakes the defense of a suit against the insured, where the damages sought are in excess of policy limits, cannot arbitrarily refuse a settlement within policy limits," and in such circumstances, the "insured may effect a reasonable settlement himself without breaching any conditions of the policy." *Krutsinger v. Illinois Casualty Co.*, 10 Ill. 2d 518, 527 (1957); see *Cramer v. Insurance Exchange Agency*, 174 Ill. 2d 513, 526 (1996) (recognizing that claim for breach of good-faith duty to settle arises where insurer refuses to settle third-party liability claim on behalf of insured and may be liable for the full amount of a judgment regardless of policy limits); *cf. Charter Oak Fire Insurance Co. v. Color Converting Industries Co.*, 45 F.3d 1170 (7th Cir. 1995) (finding insurer's delay in settling did not amount to a breach of good-faith duty, because insurer was merely still investigating claim, was not exposing insured to an excess judgment, and thus the insured's payment in settlement constituted a voluntary payment).

As there is no Illinois case directly on point, plaintiffs rely on *Fireman's Fund Insurance Co. v. Security Insurance Co. of Hartford*, 72 N.J. 63, 75, 367 A.2d 864, 870 (1976), in support of its position that the no-action clause should not protect ISMIE where the parties settled the case when ISMIE breached its good-faith duty to settle. In *Fireman's Fund*, Security Insurance had issued a $50,000 professional-malpractice insurance policy for a law firm, and Fireman's Fund had issued an excess policy for $250,000. *Fireman's Fund*, 72 N.J. at 67, 367 A.2d at 866. Both insurers had hired a single attorney to defend the law firm after a malpractice lawsuit was filed against it. Shortly before that malpractice lawsuit was to come to trial, the plaintiffs had offered to settle for $147,000. *Fireman's Fund*, 72 N.J. at 67-68, 367 A.2d at 866. Security Insurance refused to settle or to contribute its $50,000 toward the settlement despite the request of its insured, Fireman's Fund, and the trial attorney it had hired. *Fireman's Fund*, 72 N.J. at 68, 367 A.2d at 866. Fireman's Fund and the insured eventually settled the matter for $135,000, and Fireman's Fund, as assignee of the insured, filed an action seeking recovery of the $50,000 from Security Insurance, which it alleged acted in bad faith in refusing to settle. *Fireman's Fund*, 72 N.J. at 68, 367 A.2d at 866. Security Insurance made no challenge to the finding that it had acted in bad faith in refusing to settle. The record showed that it knew that an adverse verdict would have exceeded $400,000 and possibly reached $542,000. It had further refused to settle despite the recommendation of its own retained attorney, its claims manager, and the insured. *Fireman's Fund*, 72 N.J. at 69, 367 A.2d at 867.

Security Insurance did, however, raise its no-action provision in its defense. The court stated that while the right to control settlements is reserved to the insurer and an important provision in the insurance contract, that right is forfeited when the insurer "violates its own contractual obligation to the insured." *Fireman's Fund*, 72 N.J. at 71, 367 A.2d at 868. The court acknowledged Security Insurance's argument that it had fully defended its insured and could not be said to have breached its contract, but pointed out that an implied covenant of good faith and fair dealing is embodied in every contract and that an insurer is bound to comply with such covenants before relying on the powers reserved to it by the language of the contract. *Fireman's Fund*, 72 N.J. at 72, 367 A.2d at 869. Because Security Insurance had breached an implied good-faith duty, its insured was free to protect its own interest in minimizing a potential liability in excess of the policy limit by agreeing to a reasonable good-faith settlement and by recovering the policy limit from Security Insurance. *Fireman's Fund*, 72 N.J. at 73, 367 A.2d at 869.

The court went on to explain the consequences of a breach of a good-faith duty to settle, acknowledging that the consequences differ depending upon the circumstances. For instance, if, at the time the settlement offer is being considered, the potential award is within the policy limits, then there is no reason to deprive the insurer—the only one at that point bearing a monetary risk—of its absolute right to control the litigation. *Fireman's Fund*, 72 N.J. at 74, 367 A.2d at 870. In that situation, even if the insured believes the insurer is acting in bad faith, it is appropriate to hold that the insured has no alternative but to await trial, and if it results in a judgment in excess of the policy limits, then to institute an action against the insurer to recover the amount by which the judgment exceeded the proposed settlement amount. *Fireman's Fund*, 72 N.J. at 74-75, 367 A.2d at 870. If the circumstances at the time of settlement establish that the potential loss and the proposed settlement by far exceed, as they did in *Fireman's Fund*, the limits of the policy, the insured need not await the outcome of the trial and may proceed to make a prudent settlement. *Fireman's Fund*, 72 N.J. at 74, 367 A.2d at 870. Then, upon proof of the insurer's breach of its good-faith duty to settle, it may recover the amount of the policy limits from the insurer. *Fireman's Fund*, 72 N.J. at 74, 367 A.2d at 870.

The dissent in *Fireman's Fund* criticized the majority's holding, arguing that the insured receives protection under existing law because if the insurer's gamble by going to trial leads to an adverse judgment, the insurer would be liable for any excess judgment upon a bad-faith claim. If the insurer wins at trial, the insured reaps that

benefit along with the insurer. Thus, the dissent believed that the majority's decision to allow an insured to settle without the consent of the insurer was bad public policy because it allows an insured to decide that an insurer is acting in bad faith at a time when neither the insured nor the insurer can be certain of the outcome. *Fireman's Fund*, 72 N.J. at 83, 367 A.2d at 875 (Clifford, J., dissenting, joined by Mountain and Conford, JJ.). The dissent argued that effective administration of liability insurance requires the insurer's complete control over the negotiation and litigation, and the majority's holding could lead to claimants playing off insurers against insureds. *Fireman's Fund*, 72 N.J. at 84, 367 A.2d at 876 (Clifford, J., dissenting, joined by Mountain and Conford, JJ.). The dissent further saw problems with the insured's ability to establish its damages when it did not allow the case to be tried and result in a judgment in excess of the $50,000 policy limit. The insured, by settling on its own, precluded the possibility of either (1) a later settlement by the insurer; (2) a judgment for less than the policy limit; (3) a judgment in favor of the insured; or (4) a judgment for more than the policy limit for which the insurer would have had to pay as a matter of law assuming it acted in bad faith in refusing to settle. *Fireman's Fund*, 72 N.J. at 86-87, 367 A.2d at 877 (Clifford, J., dissenting, joined by Mountain and Conford, JJ.).

We find other cases outside of this jurisdiction also helpful. In *Crawford v. Infinity Insurance Co.*, 139 F. Supp. 2d 1226, 1228-29 (D. Wyo. 2001), an insured settled an auto-accident claim with the plaintiff for $700,000, after his insurer, which agreed to settle for the $15,000 policy limit, refused to actually pay. When the insured sued, Infinity relied on its no-action clause, arguing that it precluded the insured from recovering the policy limit, and the trial court held that the no-action clause would not be enforced if Infinity acted in bad faith or breached its duty to defend. The case proceeded to a jury trial, and the jury verdict was entered in favor of the insured, finding that Infinity had acted in bad faith by failing to defend and by failing to settle the claim within the policy limit. *Crawford*, 139 F. Supp. 2d at 1229. Infinity, like ISMIE, objected to the rule that the no-action provision was ineffective where the insurer breached its good-faith duty to settle and the settlement was reasonable and made in good faith, and Infinity argued that the no-action provision should be deemed ineffective only where the insurer unjustifiably refused to defend a suit. *Crawford*, 139 F. Supp. 2d at 1231. The court rejected Infinity's claim, citing cases in New York and Nebraska, which acknowledged that insurers may breach their duty of good faith in ways other than refusing to defend. *Crawford*, 139 F. Supp. 2d at 1231. The court held that under Wyoming law, an insured may enter into a reasonable settlement

where the insurer acted with bad faith in failing to settle a claim within policy limits, and the court went on to uphold the jury's verdict. *Crawford*, 139 F. Supp. 2d at 1231-32.

Similarly, in *Rupp v. Transcontinental Insurance Co.*, No. 2:07—CV—333—7C—PMW (D. Utah August 6, 2008), the primary insurers refused to settle a personal-injury action against an insured for $6 million when it knew that an adverse judgment was likely to exceed $10 million. Eventually, the insured and the excess carrier settled with the plaintiff for $8 million, and the insured filed suit against the primary insurers to recover the policy limits, which totaled nearly $4 million. *Rupp*, slip op. at 7. The primary insurers raised the no-action provision in their defense, but the court rejected that argument. *Rupp*, slip op. at 49. The court held that "an insured facing the significant likelihood of an excess judgment is not required to take the case to trial before a cause of action for bad faith accrues." *Rupp*, slip op. at 54.

We find the rationale in *Fireman's Fund*, *Crawford*, and *Rupp* persuasive and based on sound reasoning that is consistent with Illinois law and policy. Here, it would be unfair to enforce the no-action provision against Dr. Hecht for securing a reasonable settlement if ISMIE breached its good-faith duty to settle and exposed Dr. Hecht to liability exceeding the policy limits, despite the case not having been tried and despite ISMIE's initial fulfillment of its duty to defend. Breach of the good-faith duty to settle is considered by other jurisdictions, and we agree, to be an extension of the duty to defend. See *Rupp*, slip op. at 53; *Isadore Rosen & Sons, Inc. v. Security Mutual Insurance Co.*, 31 N.Y.2d 342, 348, 291 N.E.2d 380, 382, 339 N.Y.S.2d 97, 101-02 (1972).

The cases upon which ISMIE relies are distinguishable. For instance, in *Piper v. State Farm Mutual Automobile Insurance Co.*, 1 Ill. App. 2d 1 (1953), there was no allegation that the insurer had breached a good-faith duty to settle or defend when the court enforced the no-action provision against the insured. In *Burkart v. Toraason*, 107 Ill. App. 3d 92, 93 (1982), the issue before the court was whether the no-action provision, which stated that no action could be brought against the insurer unless the amount of the loss had been fixed by a court of last resort after trial or by agreement of the parties, precluded recovery until appellate review of the judgment had been exhausted. In *Allstate Insurance Co. v. United Services Automobile Ass'n*, 249 Va. 9, 13, 452 S.E.2d 859, 861-62 (1995), the court upheld Allstate's no-action provision against USAA after USAA settled a negligence action against an insured that both carriers had insured on a primary basis. While Allstate had refused to settle or contribute toward the settle-

ment, the court noted that Allstate may have owed its insured a common-law duty to protect her against the threat of a judgment in excess of its policy limits, and the insured was not contending that Allstate breached that duty. *Allstate*, 249 Va. at 13, 452 S.E.2d at 861. The court's holding was limited in that the court did not analyze whether Allstate owed to USAA or its insured a good-faith duty to settle or whether it breached that duty when it enforced the no-action provision. *Allstate*, 249 Va. at 13, 452 S.E.2d at 861. Accordingly, ISMIE's cases do not address the narrow issue presented in this case and are inapplicable. Therefore, the no-action provision may be rendered unenforceable if plaintiffs establish that ISMIE breached its good-faith duty to settle.

### E. Good-Faith Duty

Plaintiffs' argument in their motion for summary judgment and on appeal regarding a good-faith duty to settle is entangled in the various counts alleged against ISMIE and undermines the applicability of the no-action clause, which the trial court based its judgment upon.[5] We first will address count I, the enforcement of Dr. Hecht's right to select coverage by Dr. Hecht's assignees. Regarding the duty owed to Dr. Hecht, ISMIE argues that plaintiffs failed to offer any evidence that Dr. Hecht suffered an injury, and thus, he had no claim against ISMIE to assign. ISMIE argues that Dr. Hecht suffered no loss because plaintiffs paid all of the loss and he did not assume any personal liability.

An insurance provider has a duty to act in good faith in responding to settlement offers. *Haddick v. Valor Insurance*, 198 Ill. 2d 409, 414 (2001). If the insurer breaches this duty owed to its insured, it may be liable for the entire judgment against its insured, including any amount in excess of policy limits. *Haddick*, 198 Ill. 2d at 414. The basis for the duty to settle is the insurer's exclusive control over settlement negotiations and defense of litigation. *Haddick*, 198 Ill. 2d at 414. "This exclusive control, however, necessarily results in a conflict of interest between the insurance provider and its insured." *Haddick*, 198 Ill. 2d at 415. Because of the conflict, the insurer may have an incentive to decline a settlement offer and proceed to trial, believing that it may win, when the insured would prefer to settle within policy limits and avoid the risk of trial. *Haddick*, 198 Ill. 2d at 415. "In such cases, the insurance contract itself does not provide a remedy to the

---

[5]When asked to whom ISMIE owed its good-faith duty to settle, counsel for plaintiffs responded that it owed the duty only to Dr. Hecht and not to the Hospital or Sari. Our review is therefore limited only to the duty owed to Dr. Hecht, the insured, which plaintiffs raise as assignees and subrogees.

insured faced with a judgment in excess of policy limits; therefore, the law imposes upon the insurer the duty to settle in good faith." *Haddick*, 198 Ill. 2d at 415.

When a third party seeks damages that exceed policy limits, the insured necessarily becomes concerned with personal liability when there is a reasonable probability that the insured will be found liable for an excess judgment. *Haddick*, 198 Ill. 2d at 416. At that point, the insurer must take the insured's settlement interests into consideration. *Haddick*, 198 Ill. 2d at 416. To sustain a cause of action for bad faith, the plaintiff must allege that: (1) the duty to settle arose; (2) the insurer breached the duty; and (3) the breach caused injury to the insured. *Haddick*, 198 Ill. 2d at 416. The duty of an insurer arises when there is a reasonable probability of recovery in excess of policy limits and there is a reasonable likelihood of a finding of liability against the insured. *Central Illinois Public Service Co. v. Agricultural Insurance Co.*, 378 Ill. App. 3d 728, 737 (2008). In determining whether there was bad faith, the court will consider factors such as the existence of an offer by the plaintiff to settle within the policy limits, a refusal to negotiate, the advice of defense counsel, the prospect of an adverse verdict, and the potential for damages in excess of the policy limits. *Central Illinois*, 378 Ill. App. 3d at 737. Generally, an insurer is not required to initiate settlement negotiations unless the probability of an adverse finding on liability is great and the amount of probable damages would greatly exceed policy limits. *Haddick*, 198 Ill. 2d at 417 n.1. The fact that an excess judgment was entered against the insured constitutes the damage that permits the insured to recover for the breach of the duty owed. *Scroggins v. Allstate Insurance Co.*, 74 Ill. App. 3d 1027, 1030 (1979). Whether an insurer has acted in bad faith by failing to settle a claim is a question of fact for the fact finder. *Haddick*, 198 Ill. 2d at 419. When the insurer arbitrarily refuses to settle within policy limits, the insured may effect a reasonable settlement himself without breaching any conditions of the policy. *Krutsinger*, 10 Ill. 2d at 527.

As assignees of Dr. Hecht in count I of the complaint (enforcement of Dr. Hecht's right to select coverage), plaintiffs have no greater or lesser rights than the doctor. ISMIE argues that Dr. Hecht has not been injured by ISMIE's failure to contribute $1 million toward the settlement, because there was no judgment or settlement in excess of his policies and he has paid nothing out of pocket. In addition to ISMIE's argument that the no-action provision should be enforced when ISMIE did not fail to defend Dr. Hecht, ISMIE argues that Dr. Hecht was not damaged. At oral argument, ISMIE argued that had it proceeded to trial, lost, and been found to have acted in bad faith in

refusing to settle, then Dr. Hecht could have established damages. But, because Dr. Hecht chose to settle without ISMIE's consent, he could not now force ISMIE to pay against its will. While a judgment after trial is certainly good evidence of damages, it is not the only evidence the court will accept in a bad-faith action against the insurer. *Rupp*, slip op. at 51. Plaintiffs still must establish that the duty to settle arose, meaning that there was a reasonable probability that Dr. Hecht would be found liable and that there was a reasonable probability that Dr. Hecht would be personally liable for an excess judgment, and they must establish that the settlement agreement was reasonable and entered into in good faith.

■ The case ISMIE relies on, *National Union Fire Insurance Co. v. Continental Illinois Corp.*, 673 F. Supp. 267 (N.D. Ill. 1987), does not support its argument. In *National Union,* the insurers refused to accept a $68 million settlement of a securities-litigation claim. The Federal Deposit Insurance Corporation (FDIC), as assignee of Continental Illinois, proceeded to settle the matter for $88 million, and then sought recovery from the insurers for failing to accept the lower proposed settlement. *National Union,* 673 F. Supp. at 269, 272. FDIC sought to recover damages through an assignment of rights to seek indemnification in two ways: (1) a claim within the policy limits; and (2) a claim for an amount in excess of the policy limits. *National Union,* 673 F. Supp. at 269. We find *National Union* distinguishable because it addressed only the second argument posed by FDIC. *National Union,* 673 F. Supp. at 269-70. In this case, plaintiffs seek only the $1 million policy limit from ISMIE and not a sum in excess of the policy limit, and a closer reading of *National Union,* in fact, supports plaintiffs. The court in *National Union,* in distinguishing that FDIC was seeking indemnity in excess of the policy limits from its claim seeking enforcement up to the policy limits, stated that ordinarily enforcement of settlement agreements against insurers that breached their good-faith duty to settle involved only the policy limits. *National Union,* 673 F. Supp. at 274, citing *Fireman's Fund,* 72 N.J. at 73, 367 A.2d at 869 (stating breach of an insurer's covenant to exercise good faith in considering an offer to settle leaves the insured free to protect his own interest by agreeing to a reasonable good-faith settlement and then, on proof of the insurer's default, to recover from it the amount of its policy limits); *Evans v. Continental Casualty Co.*, 40 Wash. 2d 614, 628, 245 P.2d 470, 479 (1952) (finding that insured may recover amounts paid, up to policy limits, where insurer was guilty of bad faith in failing to settle a claim, if settlement procured by insured was reasonable and made in good faith). Here, plaintiffs are not seeking excess damages, and such damages are immaterial because plaintiffs

have precluded excess damages by taking actions to mitigate such damages. Therefore, we reject ISMIE's claim that, because Dr. Hecht suffered no personal damages in excess of the ISMIE policy limit, he would be unable to recover the policy limit if ISMIE breached its good-faith duty to settle.

■ The question remains whether ISMIE breached a good-faith duty to settle and that question is one of fact. *Haddick*, 198 Ill. 2d at 419. Whether it was likely that Dr. Hecht would be found liable and whether the amount of potential damages exposed Dr. Hecht to personal liability remain disputed material issues of fact based on the record before us. While ISMIE argues that it does not have to pay where plaintiffs have not proven that Dr. Hecht was negligent in the underlying action, the basis of ISMIE's argument is incorrect. Plaintiffs need not establish actual liability to the party with whom Dr. Hecht settled but only that he settled in reasonable anticipation of liability. *Federal Insurance*, slip op. at 7. The determination of whether Dr. Hecht's anticipation of liability was reasonable would depend on the quality and quantity of proof that Dr. Hecht would expect to be presented against him in the underlying action. The burden of demonstrating the reasonableness of his anticipation of liability would rest on Dr. Hecht, the insured, since he was the party who agreed to settle. *Federal Insurance*, slip op. at 4. While the record contains evidence that the probability of an adverse finding against Dr. Hecht was high and that a potential jury award would be in the multimillion dollar range, the record also contains conflicting testimony and documents, in which Temple and the physician review committee believed the case was medically defensible. Further, the range of potential jury awards in the record was wide ($0 to $65 million). When such material issues of fact are presented, summary judgment is inappropriate. Accordingly, summary judgment should not have been granted in favor of ISMIE as to count I (enforcement of Dr. Hecht's right to select coverage).

Moving on to count II (enforcement of Dr. Hecht's right to select coverage by subrogee), we find summary judgment was inappropriate for the same reasons stated for count I. A claim for equitable or contractual subrogation requires the following elements: (1) the defendant carrier must be primarily liable to the insured for a loss under an insurance policy; (2) the plaintiff carrier must be secondarily liable to the insured for the same loss under its policy; and (3) the plaintiff carrier must have discharged its liability to the insured and at the same time extinguished the liability of the defendant carrier. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 323 (2004). Plaintiffs cannot establish the first element of their subroga-

tion claim unless they establish that ISMIE breached its good-faith duty to settle owed to its insured. Accordingly, summary judgment should not have been granted as to count II, because whether ISMIE breached its good-faith duty to settle involves material issues of fact.

■ In count IV, Sari claimed that ISMIE owed the $1 million under the doctrines of horizontal exhaustion, as recognized in *Missouri Pacific*, and reimbursement, as provided in *Schal Bovis II*. Under Illinois law, all underlying coverage must be exhausted before excess coverage may be reached. *Missouri Pacific*, 288 Ill. App. 3d at 81. This principle, known as "horizontal exhaustion," is required because excess coverage carries a smaller premium than primary coverage, due to the lesser risk insured. *Missouri Pacific*, 288 Ill. App. 3d at 81. Here, there is no dispute that ISMIE and the Hospital provided primary coverage and that Sari provided excess coverage. Sari then pled that it was entitled to reimbursement as provided in *Schal Bovis II* because of ISMIE's failure to contribute its $1 million to the settlement. Sari failed to expound on how *Schal Bovis II* applies to its theory of reimbursement in its complaint or in its brief. Instead, in its brief, Sari makes the same argument that it made regarding its equitable-subrogation claim in count II. We presume the citation to *Schal Bovis II* was for the proposition that an excess insurer may seek reimbursement where it has been determined that the primary insurer was required to pay on behalf of its insured and where the excess insurer overpaid because such primary limits were not yet exhausted. *Schal Bovis II*, 315 Ill. App. 3d at 364. Whether ISMIE was required to pay has not yet been determined and depends upon resolution of the factual questions pertaining to whether ISMIE breached its good-faith duty to settle. Accordingly, count IV and Sari's citation to boilerplate holdings regarding horizontal exhaustion and reimbursement do not help this court in determining whether ISMIE was required to pay at all. Whether ISMIE was required to pay depends upon whether it breached its good-faith duty to settle on behalf of Dr. Hecht. Therefore, summary judgment was inappropriate as to count IV to the extent that count IV is a reiteration of the equitable-subrogation claim in count II.

### F. ISMIE's Defenses

■ In addition to its no-action clause defense, ISMIE raised other arguments that, if accepted, preclude plaintiffs' recovery as a matter of law. First, ISMIE argues that the contract provision relating to the physician review committee was controlling, and, thus, summary judgment was appropriate. The physician review committee provision stated that if there was a dispute between ISMIE and the insured

regarding whether to settle, either party could request review by the physician review committee and the committee's recommendation was binding. Here, the physician review committee recommended against settling, and ISMIE argued that the recommendation was binding. However, we are not convinced that this provision of the contract was properly triggered. Dr. Hecht, Paul Cicero (Dr. Hecht's private counsel), Greg Snyder (Dr. Hecht's counsel paid by ISMIE), the Hospital and its counsel, and Temple (in her letter requesting the committee review the case in 2002) recommended that the case be settled because of the potential for a high damages award, among other problems with the defense (Dr. Hecht's ability as a witness, certain facts, the technical nature of the suit, sympathetic plaintiff, notoriety of plaintiff's counsel). If Temple, an agent of ISMIE, agreed to recommend settlement, then it appears there was no disagreement between ISMIE and Dr. Hecht, and therefore, the provision was not triggered. However, there are other documents in the form of claims notes that indicated ISMIE believed the case was medically defensible. Again, whether this provision was properly triggered when there is a dispute in the facts is not an appropriate question to be resolved by summary judgment. Thus, the defense should be presented to the trier of fact upon remand. With that being said, we note that even if this provision was triggered, this provision does not relieve ISMIE of its good-faith duty to settle, as the good-faith duty is to be determined in a court of law, not by a panel of physicians.

■ Second, ISMIE argues that plaintiffs' $5 million settlement payment was voluntary, thereby precluding them from recovering as subrogees. ISMIE argues that plaintiffs' payments were voluntary because their policies afforded no coverage for the incident. ISMIE argues that their policies do not cover "personal acts" of the doctor, and the doctor "personally performed" the cardiac biopsy. We find this argument to be disinguous, as normally "personal acts" are those acts performed outside of the scope of employment. Dr. Hecht was clearly acting within the scope of his employment. Further, plaintiffs did not dispute that their policies provided coverage for Dr. Hecht's conduct, and we give great deference to the parties' interpretation of their contracts because the parties are in the best position to know what was intended by the language employed. *Barney v. Unity Paving, Inc.*, 266 Ill. App. 3d 13, 18 (1994). Even if the exclusion for personal acts was ambiguous, any ambiguity is construed against the drafter of the policy and in favor of coverage, and therefore, we reject ISMIE's argument that the Hospital and Sari policies did not provide coverage for Dr. Hecht's conduct in the *Tripp* matter. *West Bend Mutual Insurance Co. v. Rosemont Exposition Services, Inc.*, 378 Ill. App. 3d 478, 486 (2007).

### G. Unjust Enrichment and *Quantum Meruit* Claims

■ Counts V and VI are the final claims that plaintiffs alleged and were based on theories of unjust enrichment and *quantum meruit*, respectively. When a person obtains money to which he is not entitled, under circumstances such that in equity and good conscience he ought not to retain it, a constructive trust may be imposed to avoid unjust enrichment. *Smithberg v. Illinois Municipal Retirement Fund*, 192 Ill. 2d 291, 299 (2000). However, unjust enrichment is based on an implied contract, and it does not apply where there is a specific contract that governs the relationships of the parties. *People ex rel. Hartigan v. E&E Hauling, Inc.*, 153 Ill. 2d 473, 497 (1992). Thus, summary judgment on the unjust-enrichment count was proper as a matter of law.

We similarly affirm summary judgment on the *quantum meruit* claim because in order to establish the elements of *quantum meruit* a plaintiff is required to establish that no contract existed addressing the parties' relationship. *Chicago Hospital Risk Pooling Program v. Illinois State Medical Inter-Insurance Exchange*, 325 Ill. App. 3d 970, 983 (2001), citing *Canal & Hale, Ltd. v. Tobin*, 304 Ill. App. 3d 906, 913 (1999).

### H. Interest and Costs

■ If ISMIE owed the money, plaintiffs would be entitled to prejudgment interest under the Interest Act (815 ILCS 205/2 (West 2002)). The existence of a good-faith defense to the suit between plaintiffs and ISMIE does not preclude an award of prejudgment interest, and courts have granted prejudgment interest in disputes involving two insurance companies. *Liberty Mutual Insurance Co. v. Westfield Insurance Co.*, 301 Ill. App. 3d 49, 55 (1998). Therefore, this issue should be addressed upon remand and resolution of the issues discussed herein.

Section 155 of the Insurance Code (215 ILCS 5/155(1) (West 2002)) provides:

"(1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

(a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

(b) $25,000;

(c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action."

In determining whether section 155 sanctions should be imposed, the trial court must consider the totality of the circumstances. *Golden Rule Insurance Co. v. Schwartz*, 203 Ill. 2d 456, 469 (2003). Here, the trial court did not make a finding on this issue, and therefore, this issue is remanded for further consideration.

## III. CONCLUSION

In conclusion, we reject the Hospital's claim that the ISMIE policy intended to cover $1 million of the $1.5 million SIR limit and, thus, affirm summary judgment in favor of ISMIE as to count III (equitable contribution). We also affirm summary judgment in favor of ISMIE as to counts V and VI (unjust enrichment and *quantum meruit*). We reverse and remand as to counts I, II, and IV, for resolution by the fact finder of the material issues of fact identified in this opinion. Further, upon remand, the trial court shall address interest and costs pursuant to the Interest Act and section 155 of the Insurance Code.

Affirmed in part and reversed in part; cause remanded.

McLAREN and BURKE, JJ., concur.